888 P.2d 1323

**ARIZONA MUNICIPAL WATER USERS ASSOCIATION, an Arizona non-profit corporation, Plaintiff–Appellee,**

v.

**ARIZONA DEPARTMENT OF WATER RESOURCES, an agency of the State of Arizona; and Elizabeth Ann Rieke, in her capacity as Director of Water Resources, Defendants–Appellants.**

No. 1 CA–CV 91–0581.

Court of Appeals of Arizona, Division One, Department B.

May 17, 1994.

Review Denied Feb. 22, 1995.

Arizona Dept. of Water Resources, Terese Neu Richmond, Chief Counsel by Michael J. Pearce, Deputy Counsel, Charles L. Cahoy, Phoenix, for appellants.

Kathleen Ferris, Phoenix, for appellee.

## OPINION

TOCI, Judge.

This appeal involves a dispute between the Arizona Department of Water Resources ("the Department") and the Arizona Municipal Water Users Association ("the Association"), a non-profit corporation composed of a

number of Arizona cities and towns,[1] as to how the Groundwater Code is to be interpreted.

According to a groundwater management plan authorized by statute, the Department establishes a municipal water provider's total gallons per capita per day ("GPCD") requirement. This GPCD requirement limits the total amount of water that such provider is legally entitled to "withdraw, divert or receive" during the year. In simple terms, if the total amount of water used by a municipal provider from all sources, including groundwater, exceeds the provider's GPCD requirement, the provider is out of compliance with the management plan to the extent that groundwater usage makes up the excess. Although the management plan includes water from all sources in determining whether a municipal provider has exceeded its GPCD requirement, groundwater usage is counted last. According to the management plan:

> This is consistent with the intent of the Groundwater Code that other available sources of water be used before groundwater is used. It also allows the Department to determine whether, and to what extent, the provider has failed to reasonably reduce its per capita use of groundwater. If the total amount of water used by the provider during the year exceeds the amount of water reasonably necessary for its use, as reflected in its total GPCD requirement, the provider has failed to conserve the groundwater included in the excess.

Arizona Department of Water Resources, *Management Plan for the Second Management Period, 1990–2000: Phoenix Active Management Area* 264 (1991) ("Second Management Plan").

1. The Association is comprised of the cities of Phoenix, Scottsdale, Mesa, Glendale, Tempe, Chandler, Peoria, Goodyear, and the town of Gilbert. The mayors of these municipalities serve as he Association's Board of Directors.

2. An "active management area" is a geographical area designated by the legislature as requiring active management of groundwater. A.R.S. § 45–402(2) (1994). The four initial AMAs are

The basic question for decision is whether, in calculating if a municipal provider of groundwater is in compliance with the limitations for groundwater usage that have been placed upon it by the Department, recovered effluent is to be included or excluded from consideration. If recovered effluent is excluded from the calculation, a municipal provider may use more groundwater in meeting its requirements and still remain in compliance with the plan.

## I. STATUTORY BACKGROUND

In 1980, the legislature found that the depletion of the state's underground water resources threatened the economy and general welfare of the state. Ariz.Rev.Stat.Ann. ("A.R.S.") § 45–401(A) (1994). In the interest of protecting and stabilizing the general economy and welfare, the legislature enacted the Groundwater Code to "conserve, protect and allocate the use of groundwater resources of the state and to provide a framework for the comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater in this state." A.R.S. § 45–401(B). To further this policy, the legislature delineated four initial active management areas ("AMA")[2] where groundwater overdraft was most severe.

The legislature directed the Department to develop a forty-five year conservation and management program and to implement such program through a series of five management plans for each initial AMA. A.R.S. § 45–563 (1994). The water management goal for the Phoenix, Prescott, and Tucson AMAs is "safe yield"[3] by January 1, 2025. A.R.S. § 45–562(A) (1994). To achieve this

· Phoenix, Tucson, Pinal, and Prescott. A.R.S. § 45–402(15).

3. "Safe yield" is defined as:
   [A] groundwater management goal which attempts to achieve and thereafter maintain a long-term balance between the annual amount of groundwater withdrawn in an active management area and the annual amount of natural and artificial groundwater recharge in the active management area.

management goal, the legislature required the Department to include in each AMA management plan a "continuing mandatory conservation program for all persons withdrawing, distributing or receiving groundwater designed to achieve reductions in withdrawals of groundwater." A.R.S. § 45–563.

For the first management period, 1980 to 1990, the Groundwater Code required the Department to establish for each initial AMA a "conservation program for all non-irrigation uses of groundwater." A.R.S. § 45–564(A)(2) (1994). The term " 'non-irrigation use' means a use of groundwater other than irrigation use"; this term includes municipal uses. A.R.S. § 45–402(26). For municipal uses, "the program shall require reasonable reductions in per capita use" of groundwater. A.R.S. § 45–564(A)(2). Complying with this legislative mandate, in 1984, the Department adopted the First Management Plan for the Phoenix AMA.

Under the First Management Plan, large municipal water providers were required to either maintain or reduce the GPCD consumption of groundwater by their customers. In other words, the customer's per capita requirements established the limit on usage under the First Management Plan. In determining whether a municipal water provider exceeded its GPCD limit, the Department did not count effluent [4] "withdrawn, diverted, or received by the municipal provider for non-irrigation use." Arizona Department of Water Resources, *Management Plan for First Management Period, 1980–1990: Phoenix Active Management Area* 79 (1984). The First Management Plan remained in effect until the effective date of the Second Management Plan. A.R.S. § 45–564(C).

In 1986, the legislature enacted the Underground Water Storage Act ("Storage Act"),

A.R.S. sections 45–801 through 45–895 (1994), to help reduce overdraft of water resources, to provide water in times of shortage, and to increase the water supply for future growth and development. A.R.S. § 45–801 (1994). The Storage Act requires that the Department must issue a permit before an underground storage and recovery project may be operated. A.R.S. § 45–804(A) (1994). A permit holder may recover water that has been stored underground, A.R.S. section 45–807 (1994), but the holder may use or exchange the recovered water "only in the manner in which it was permissible for the holder to use or exchange the water before it was stored underground," A.R.S. section 45–808 (1994). By means of storage accounts, the Department monitors the amount of water each project stores and recovers. A.R.S. § 45–809 (1994). Under the Storage Act, a permit holder may recover water stored pursuant to such permit from wells located:

(a) Within the area of hydrologic impact of the project as determined by the director.

(b) Outside the area of hydrologic impact of the project but within an active management area, if the director determines that recovery at the proposed location is consistent with the management plan and achievement of the management goal for the active management area subject to the following:

(i) If the proposed recovery well is located within the exterior boundaries of the service area of a city, town, private water company or irrigation district, that city, town, private water company or irrigation district is the permit holder or has consented to the location of the recovery well.

(ii) If the proposed recovery well is located outside, but within three miles of,

A.R.S. § 45–561(12) (1994).

4. "Effluent" is defined in A.R.S. section 45–101(3) (1994) as "water that has been collected in a sanitary sewer for subsequent treatment in a facility that is regulated pursuant to §§ 49–361 and 49–362. Such water remains effluent until it acquires the characteristics of groundwater or surface water." A "sanitary sewer," referred to

in the above definition, means "a pipe or other enclosed conduit that carries, among other substances, any water-carried wastes from the human body from residences, commercial buildings, industrial plants or institutions." A.R.S. § 45–101(7).

the exterior boundaries of the service area of a city, town, private water company or irrigation district, the closest city, town, private water company or irrigation district has consented to the location of the recovery well.

A.R.S. § 45–807(A)(1).

For the second management period, 1990 to 2000, the legislature required the Department to establish additional conservation requirements for all non-irrigation uses of groundwater. A.R.S. § 45–565(A)(2) (1994). This section required the Department to mandate for municipal uses "additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users." *Id.* These conservation goals must be achieved by the end of the second management period. *Id.*

The Second Management Plan provides that large municipal water providers may not exceed their GPCD limits for the non-irrigation uses they supply.[5] In addition, the amount of lost and unaccounted for water in each provider's municipal water distribution system may not exceed ten percent of the total quantity of water withdrawn, diverted, or received by the provider on an annual or three year average basis.[6]

Under the Second Management Plan, the Department determines whether a municipal water provider is in compliance with these groundwater conservation limits by including, in addition to other sources of water, the amount of "recovered effluent" used by such provider. The Second Management Plan defines "recovered effluent" as "effluent that has been stored pursuant to an underground storage and recovery permit and recovered outside the area of hydrologic impact." Second Management Plan, *supra,* at 139. This definition refers to the storage of effluent and its recovery under the provisions of the Storage Act.[7] In other words, the quantity of groundwater a municipal provider may permissibly use is reduced by the quantity of water recovered by such provider from wells located beyond the limits of the stored water's migration capability.

The Department determines municipal compliance with the groundwater conservation requirements by use of the "stacking" method. Second Management Plan, *supra,* at 263–65. According to the Department, the stacking method allows water providers greater flexibility to vary their groundwater use with the availability of water from alter-

---

**5.** Section 5–103(A) of the Second Management Plan provides:

Unless accepted into the Alternative Conservation Program or designated as an institutional provider:

1. For the calendar years 1992 through 1994, each existing large provider shall withdraw, divert or receive water from any source, including effluent only if it is recovered effluent, for non-irrigation use at or below its first intermediate total GPCD requirement as assigned in Appendix 5–E.

2. For the calendar years 1995 through 1999, each existing large provider shall withdraw, divert or receive water from any source, including effluent only if it is recovered effluent, for non-irrigation use at or below its second intermediate total GPCD requirement as assigned in Appendix 5–E.

3. For the calendar year 2000, and for each calendar year thereafter until the first compliance date for any substitute total GPCD requirement in the Third Management Plan, each existing large provider shall withdraw, divert or receive water from any source, including effluent

only if it is recovered effluent, for non-irrigation use at or below its final total GPCD requirement as assigned in Appendix 5–E.

Second Management Plan, *supra,* at 141.

**6.** Section 5–113 of the Second Management Plan provides, in relevant part:

For the calendar year 2000, or the calendar year in which the provider commences operation, whichever is later, and for each calendar year thereafter until the first compliance date for any substitute requirement in the Third Management Plan:

1. A large provider shall not operate a distribution system in a manner such that lost and unaccounted for water exceeds ten percent of the total quantity of water from any source, including effluent only if it is recovered effluent, withdrawn, diverted or received by the large provider on an annual or three-year average basis.

Second Management Plan, *supra,* at 163.

**7.** *See supra* discussion of Storage Act.

nate sources. Under this method, the Department first counts against the provider's total GPCD requirement,[8] all water used by a water provider during the year, except for spillwater and effluent that is not recovered effluent. Although water used by the provider during the year from such sources is counted when determining the provider's compliance with its total GPCD requirement, groundwater is counted last. If the provider is determined to be out of compliance with its total GPCD requirement, the provider is out of compliance only to the extent by which the amount of groundwater used exceeds the provider's total GPCD requirement.

## II. PROCEDURAL HISTORY

The procedural history of this case is as follows. After a public hearing, the Department issued the First Order of Adoption of the Second Management Plan for the Phoenix AMA. The Association filed a request for rehearing or review of the first order of adoption, requesting that the Department reverse its decision to include "recovered effluent" in its municipal compliance determinations. The Department refused to exclude "recovered effluent" from such determinations and issued the Final Order of Adoption of the Second Management Plan. The Association appealed to the Maricopa County Superior Court, which reversed the decision of the Department. This appeal followed.

## III. DISCUSSION

**A. Is the Department Prohibited from Counting Recovered Effluent in Determining Municipal Compliance with the Groundwater Conservation Requirements?**

■ The Association argues that counting recovered effluent in municipal compliance calculations is the same as regulation of effluent. The Association maintains that because our supreme court's decision in *Arizona Public Service Co. v. Long*, 160 Ariz.

429, 435–36, 773 P.2d 988, 994–95 (1989), prohibits the regulation of effluent under the Groundwater Code, the Department may not count recovered effluent in its municipal compliance calculations. We disagree. First, we conclude that *Long* is distinguishable on its facts. Second, we conclude that counting recovered effluent is not the regulation of effluent, and thus even if *Long* did apply, it would not prohibit the Department from counting recovered effluent in determining municipal compliance with the groundwater conservation requirements.

First, we observe that although the *Long* court did hold that effluent may not be regulated under the Groundwater Code, *id.*, the *Long* case involved neither the question nor the statutes at issue here. The issue in *Long* was whether a city may contract to sell effluent for use on lands other than those from which the effluent was withdrawn. *Id.* at 431, 773 P.2d at 990. Here, the issue is whether the Department, a state agency, is authorized under the Groundwater Code to count recovered effluent in determining municipal compliance with the groundwater conservation requirements of the Second Management Plan. In *Long*, the statutory provisions which were claimed to have been violated by the effluent contracts are found in Article 8 of the Groundwater Code and pertain to the transportation of groundwater. *See* A.R.S. §§ 45–541 through 45–545 (1994). Here, the applicable statutes are found in Article 9 of the Groundwater Code and provide for the management of groundwater. *See* A.R.S. §§ 45–561 through 45–578 (1994). Thus, *Long* does not control this case.

Second, the Groundwater Code authorizes the Department to enforce the management plan conservation requirements only against those municipal water providers that use groundwater. *See* A.R.S. § 45–563 (1994). Thus, a municipal water provider that uses only non-groundwater sources of water cannot be in violation of its total GPCD requirement or the other municipal groundwater conservation requirements of the Second

---

8. A water provider's total GPCD requirement is the total amount of water that such provider is legally entitled to withdraw, divert, or receive during the year.

Management Plan. For those providers that use groundwater, however, the Department measures compliance under the stacking method. Under this method, the Department measures non-compliance only to the extent which groundwater use exceeds a provider's total GPCD requirement. Accordingly, the Department regulates only groundwater usage.

The Association further argues that because no rule exists in the Second Management Plan requiring the Department to measure municipal compliance by the stacking method, the Department is free to regulate sources of water other than groundwater. We disagree. Although it is true that the Final Order of Adoption of the Second Management Plan did not refer to the stacking method, the final published version of the Plan does explain the stacking method in detail.[9] In the section setting forth the Department's method of determining compliance, the Department states:

> Although water from all sources, other than spill water and effluent which is not recovered effluent, used by the provider during the year is counted when determining the provider's compliance with its total GPCD requirement, *groundwater is counted last.*
>
> . . . .
>
> The process of counting groundwater last is called "stacking," because the groundwater is added to (or "stacked" on) the other sources of water used by the provider during the year before comparing the amount of water used with the provider's total GPCD requirement.

Second Management Plan, *supra*, at 264 (emphasis added). An administrative agency must follow its own rules and regulations; to do otherwise is unlawful. *Clay v. Arizona Interscholastic Ass'n, Inc.*, 161 Ariz. 474, 476, 779 P.2d 349, 351 (1989). Thus, the Department must follow the provisions of the Second Management Plan. Accordingly, the Department is bound to determine municipal compliance by use of the stacking method.

Finally, we think the logic of counting recovered effluent in determining municipal compliance is apparent. By definition, "recovered effluent" is water that was stored pursuant to a permit obtained under the Storage Act, and later recovered from a well located outside the area of hydrologic impact. Stored water recovered from a well located outside the area of hydrologic impact is not physically the same water that was initially stored underground. It is not the same water because the stored water is not capable of migrating to a well that lies beyond the area of hydrologic impact. Although such water is essentially deemed by A.R.S. section 45–808 to be the same type of water that was initially stored, it is in fact, groundwater. It does no violence to the statutory scheme to conclude that the Department is authorized to count such water in municipal compliance calculations designed to reduce groundwater consumption.

**B. Does the Groundwater Code Authorize the Department to Count Recovered Effluent in Determining Municipal Compliance With the Groundwater Conservation Requirements?**

We conclude that the Groundwater Code authorizes the Department to count recovered effluent in determining municipal compliance with the groundwater conservation requirements of the Second Management Plan. We reach this conclusion because the statutory scheme: (1) requires the Department to establish groundwater conservation measures and to make reasonable reductions in the per capita use of groundwater supplied by large municipal water providers, and (2)

9. Because the Second Management Plan was not published until after the record was transmitted to the Superior Court, the Department did not include the published version of the Plan in the record. Under Rule 201, Arizona Rules of Evidence, we take judicial notice of the published version of the plan. *See Climate Control, Inc. v. Hill*, 86 Ariz. 180, 188, 342 P.2d 854, 859 (1959), *modified on other grounds*, 87 Ariz. 201, 349 P.2d 771, *appeal dismissed*, 364 U.S. 409, 81 S.Ct. 180, 5 L.Ed.2d 185 (1960).

indicates a legislative intention that the Department count water used from all sources in determining municipal compliance with the groundwater conservation measures.

We first consider the rules of statutory construction. The best and most reliable index of a statute's meaning is its language and, where the statutory language is clear and unequivocal, it is determinative of a statute's construction. *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). If we find no ambiguity in the statute's language, we must give effect to that language and we may not employ other rules of statutory construction to interpret the provision. *Id.* Moreover, this court gives great weight to an agency's interpretation of statutes and its own regulations. *Sunpower of Arizona, Inc. v. Arizona Dept. of Economic Sec.,* 175 Ariz. 109, 111, 854 P.2d 142, 144 (App.1993).

Here, the plain language of A.R.S. sections 45–565(A)(2) and 45–561(11) is clear and unequivocal, and thus we must give effect to such language. Section 45–565(A)(2) specifically mandates that for municipal uses, the Department "shall require [additional] reasonable reductions in per capita use to those required in the first management period." At the time the Second Management Plan was adopted in December 1989, municipal use was defined in section 45–561(11) as "all non-irrigation uses of *water* supplied by a city, town, private water company or irrigation district." Act of May 25, 1988, 1988 Ariz.Sess.Laws 274, 278 (current version at A.R.S. § 45–561(11)) (emphasis added).

Throughout the Groundwater Code, the legislature used the general term "water" when it intended to refer to water from all sources. *See, e.g.,* A.R.S. § 45–467(D) (1994) (providing for creation of operating flexibility account to monitor agricultural uses of groundwater expressly uses term "water" to refer to all sources of water). And, when the legislature meant to distinguish between different sources of water, it used the specific terms "groundwater" or "surface water." Thus, we conclude that had the legislature intended to limit the Department to consider-ation of municipal groundwater use only, it would have used the word "groundwater" in the definition of municipal use contained in section 45–561(11). Instead, the legislature defined municipal use in general terms—"all non-irrigation uses of *water.*" Thus, when read together, A.R.S. sections 45–565(A)(2) and 45–561(11) provide the Department with the authority to count water used from sources other than groundwater in determining municipal compliance with groundwater conservation requirements. Our conclusion is bolstered by the fact that, administratively, the Department has interpreted the term "water," as used in A.R.S. section 45–561(11), to mean water from all sources, not just groundwater. *See Sunpower,* 175 Ariz. at 111, 854 P.2d at 144 (we accord great weight to an agency interpretation of a statute).

Furthermore, the legislature's 1990 amendment of the definition of "municipal use" confirms that the Department's interpretation of the term "water" as used in this section is correct. *See* Act of April 18, 1990, 1990 Ariz.Sess.Laws 235, 238. Following the 1990 amendment, "municipal use" is currently defined as:

> [A]ll non-irrigation uses of water supplied by a city, town, private water company or irrigation district, except for uses of water, other than Colorado River water, released for beneficial use from storage, diversion or distribution facilities to avoid spilling that would otherwise occur due to uncontrolled surface water inflows that exceed facility capacity.

A.R.S. § 45–561(11). This amendment specifically excludes spillwater from the municipal groundwater conservation requirements of the management plans.

Thus, the Department argues, and we agree, that if the term "water" used in the original definition of "municipal use" was limited to groundwater, the legislature would have had no reason to amend the definition of "municipal use" to expressly exclude spillwater, a form of surface water. By amending the definition of "municipal use" to specifically exclude spillwater, we think the leg-

islature implicitly intended that the term "municipal use" include all other sources of water, including effluent that is recovered effluent. In other words, had the legislature intended to exclude recovered effluent from the original definition of "municipal use," it likely would have amended the definition of "municipal use" in similar fashion to the "spillwater" amendment, specifically excluding recovered effluent.

Our statutory interpretation gives a fair and sensible meaning to sections 45–565(A)(2) and 45–561(11). *See In re Pima County Juvenile Action J–78632*, 147 Ariz. 584, 586, 712 P.2d 431, 433 (1986) ("[A] statute should be interpreted in such a way to give it a fair and sensible meaning."). The Department must comply with the legislative directive to require reasonable reductions in the per capita use of groundwater. The Department has done this in the Second Management Plan by establishing a GPCD requirement based on total water use, including surface water and recovered effluent. Because the GPCD requirement for municipal conservation is based on total water usage, and not just groundwater usage, total water usage must also be considered in determining municipal compliance with the GPCD requirement. Otherwise, the GPCD requirement would be distorted and the statutory mandate of reasonable reductions in the per capita use of groundwater could not be achieved.

In addition, interpreting the original definition of "municipal use" to include water from all sources is consistent with the one-hundred-year-old reasonable use doctrine. In Arizona, a water user has the right to use as much water as necessary to fulfill a specific need; but such use must be reasonable and beneficial. *Clough v. Wing*, 2 Ariz. 371, 17 P. 453 (1888). This legal principle was later extended to uses of groundwater. *Bristor v. Cheatham*, 75 Ariz. 227, 255 P.2d 173 (1953). The *Bristor* court recognized the inherent difficulty in applying the reasonable use doctrine when it stated:

The principal difficulty in the application of the reasonable use doctrine is in deter-

mining what is reasonable use.... What is a reasonable use must depend to a great extent upon many factors, such as the persons involved, the nature of their use and all the facts and circumstances pertinent to the issue.

*Id.* at 237, 255 P.2d at 179.

For large municipal water providers, reasonable groundwater use is defined by the Department through the municipal groundwater conservation requirements of the management plans. The level of groundwater consumption that is reasonable is relative to the quantity of water used from sources other than groundwater. By establishing groundwater conservation requirements with reference to the amount of water used from non-groundwater sources, the Department ensures that municipal water providers make only reasonable use of groundwater.

**C. By Including the Term "Effluent" in the Post-*Long* Amendments of Sections 45–467(D) and 45–576(L), did the Legislature Intend to Place Effluent Beyond the Reach of Groundwater Conservation Statutes Not Similarly Amended?**

The Association points out that after *Long* was decided, the legislature amended A.R.S. section 45–467(D), Act of May 13, 1991, 1991 Ariz.Sess.Laws, 380, 383, and A.R.S. section 45–576(L), Act of May 13, 1991, 1991 Ariz. Sess.Laws, 380, 387–88, (current version at A.R.S. section 45–576(M) (1994)), to add the word "effluent" to each of these statutes, but it did not similarly amend the other groundwater conservation statutes. Thus, the Association argues that this demonstrates that the legislature intended to allow the Department to regulate effluent only where expressly authorized. We reject this argument.

Before *Long*, sections 45–467(D) and 45–576(L) (current version at A.R.S. section 45–576(M)) specifically referred to only two sources of water—groundwater and surface water. The legislature amended these statutes by including a specific reference to "ef-

fluent," apparently in an effort to make these sections consistent with the *Long* decision. Thus, in our view, the post-*Long* amendments of these statutes do not establish a legislative intent to exclude effluent from the scope of those groundwater conservation statutes that were not amended by the legislature.

We begin our analysis on this point by observing that after *Long*, the legislature amended the definition of "effluent" itself:

> "Effluent" means *water* that has been collected in a sanitary sewer for subsequent treatment in a facility that is regulated pursuant to [sections] 49–361 and 49–362. Such water remains effluent until it acquires the characteristics of groundwater or surface water.

Act of May 13, 1991, 1991 Ariz.Sess.Laws 380, 380, (codified as amended at A.R.S. § 45–101(3)) (emphasis added). Although this definition is substantially different from the pre-amendment version,[10] the amended definition retained the first three words of the original definition—"effluent means water." Thus, the new definition of "effluent" indicates that the legislature views effluent as an independent source of "water" as that term is used throughout the Groundwater Code.

Although the term "water" in the Groundwater Code includes both groundwater and surface water, neither of these latter terms includes the other. And, after *Long*, neither "groundwater" nor "surface water" includes "effluent." Consequently, although no amendment was necessary to clarify those statutes in which the legislature used the all inclusive term "water," the post-*Long* amendments add a third source of water—effluent—to the context of those statutes employing the much narrower statutory language specifically referring only to groundwater and surface water.

For example, A.R.S. section 45–467 provides for the creation of agricultural operating flexibility accounts to monitor variations in irrigation uses of groundwater. By allowing farms to either borrow or bank water, the Department encourages agricultural conservation of groundwater. The pre-*Long* version of section 45–467(D)[11] provided "[i]f a farm is irrigated with surface water and groundwater, and uses of water from all sources for irrigation purposes" exceed or are less than certain standards, the operating flexibility account is either debited or credited, as the case may be. *See* Act of June 12, 1980, 1980 Ariz.Sess.Laws 1339, 1412–13.

After *Long*, the legislature was apparently aware that if the Department was to be allowed to count effluent for purposes of crediting agricultural operating flexibility accounts, section 43–467 had to be amended to incorporate a specific reference to effluent. And, later the legislature did amend section 45–467(D)[12] to provide for debits or credits to the flexibility account "if a farm is irrigat-

---

10. As originally enacted in 1980, the legislature defined "effluent" as:

> " 'Effluent' means water which, after being withdrawn as groundwater or diverted as surface water, has been used for domestic, municipal, or industrial purposes and which is available for reuse for any purpose, whether or not the water has been treated to improve its quality."

Act of June 12, 1980, 1980 Ariz.Sess.Laws 1339, 1353.

11. A.R.S. § 45–467(D) originally provided, in relevant part:

> D. If a farm is irrigated with *surface water and groundwater,* and uses of water by the farm from all sources for irrigation purposes in the accounting period:
> 1. Exceed the amount of the current irrigation water duty for the farm multiplied by the

water duty acres in the farm, the amount of groundwater used up to the amount of the excess shall be registered as a debit to the account.
> 2. Are less than the amount of the current irrigation water duty for the farm multiplied by the water duty acres in the farm, the amount of water not used which would have been groundwater shall be registered as a credit to the account.

Act of June 12, 1980, 1980 Ariz.Sess.Laws 1339, 1412–13 (emphasis added).

12. A.R.S. § 45–467(D) (1994) currently provides, in relevant part:

> D. [I]f a farm is irrigated with *a combination of surface water or effluent, or both, and groundwater,* and uses of water by the farm from all sources for irrigation purposes, except for surface water, other than Colorado river water, re-

ed with a combination of surface water or *effluent*, or both, and groundwater."

Likewise, the legislature must have been aware that the amendment of A.R.S. section 45–576(L) (current version at A.R.S. section 45–576(M)) was necessary because of the pre-amendment version's specific reference to groundwater and surface water. Before *Long*, section 45–576, which refers to the need for real estate developers to establish an assured water supply, defined such supply as, "[s]ufficient groundwater or surface water of adequate quality [that] will be continuously available to satisfy the water needs of the proposed use for at least one hundred years." Act of April 12, 1984, 1984 Ariz.Sess.Laws 465, 482. After *Long*, the legislature amended section 45–576 to provide that an assured water supply was "sufficient groundwater, surface water or *effluent* of adequate quality." Act of May 13, 1991, 1991 Ariz.Sess. Laws 380, 387–88 (emphasis added). The legislature obviously believed that a specific reference to effluent was essential if effluent was ever to be counted as part of an assured water supply.

Consequently, the amendments to the above statutes do not imply that by not simi-

larly amending the municipal groundwater conservation statutes, the legislature intended to place effluent beyond the reach of those unamended statutes pertaining to municipal groundwater conservation. Rather, the above amendments were necessary because the pre-amendment versions of sections 45–467(D) and 45–576(L) specifically referred only to groundwater and surface water. The amendments demonstrate a legislative awareness that after *Long*, a reference only to groundwater and surface water was insufficient to include "effluent."

The Association, however, attempts to refute this conclusion. It points out that after *Long*, the legislature also amended A.R.S. section 45–452, which in its pre-amendment form provided that in an AMA, only acres of land with a specified history of irrigation may be irrigated with "any water."[13] Act of May 13, 1985, 1985 Ariz.Sess.Laws 1124, 1125–26. The Association argues that if the Department is correct in its conclusion that the term "any water" is broad enough to include all sources of water, including effluent, there was no need for the legislature to amend section 45–452 to add the word "effluent."[14] Act of May 7, 1990, 1990 Ariz.Sess.Laws 622,

leased for beneficial use from storage, diversion or distribution facilities to avoid spilling that would otherwise occur due to uncontrolled surface water inflows that exceed facility capacity, in the accounting period:
1. Exceed the amount of the current irrigation water duty for the farm multiplied by the water duty acres in the farm, the amount of groundwater used up to the amount of the excess, *less any effluent used,* shall be registered as a debit to the account.
2. Are less than the amount of the current irrigation water duty for the farm multiplied by the water duty acres in the farm, the amount of water not used which would have been groundwater shall be registered as a credit to the account.
(Emphasis added).

**13.** Prior to the 1990 amendment, A.R.S. § 45–452(A) provided, in relevant part:

A. In an initial active management area, except as provided in subsections B and H of this section and sections 45–465.01 and 45–465.02, only acres of land which were legally irrigated at any time from January 1, 1975 through January 1, 1980, which are capable of being irrigated, which have not been retired

from irrigation for a non-irrigation use pursuant to section 45–463 or 45–469 and for which the irrigation grandfathered right has not been conveyed for a non-irrigation use, *may be irrigated with any water.*
Act of May 13, 1985, 1985 Ariz.Sess.Laws 1124, 1125–26 (emphasis added).

**14.** A.R.S. § 45–452(A) (1994) currently provides, in relevant part:

A. In an initial active management area, except as provided in subsections B and I of this section and §§ 45–172, 45–465.01 and 45–465.02, only acres of land which were legally irrigated at any time from January 1, 1975 thorough January 1, 1980, which are capable of being irrigated, which have not been retired from irrigation for a non-irrigation use pursuant to § 45–463 or 45–469 and for which the irrigation grandfathered right has not been conveyed for a non-irrigation use, *may be irrigated with any groundwater, effluent, diffused water on the surface or surface water, except that this does not prohibit irrigation with surface water used pursuant to decreed or appropriative rights established before June 12, 1980.*
(Emphasis added).

623–24. The Association further argues that by amending this section, the legislature clearly indicated its intention to reach effluent only in those statutes that it specifically amended. We disagree.

Although the legislature did amend A.R.S. section 45–452 to add the term "effluent," the legislative history of this amendment lends no support to the Association's argument. Under the pre-*Long* version of this statute, landowners with decreed or appropriative rights to surface water but without grandfathered irrigation rights were implicitly prohibited from irrigating their land with "any water." Act of May 13, 1985, 1985 Ariz.Sess. Laws 1124, 1125–26. In other words, only those with grandfathered irrigation rights could irrigate their lands with "any water." In 1990, the legislature amended A.R.S. section 45–452 to provide an exception to this prohibition. This exception allows landowners with decreed or appropriative rights established before June 12, 1980, to irrigate their lands, but they may irrigate only with surface water. Act of May 7, 1990, 1990 Ariz.Sess.Laws 622, 623–24.

Because this amendment expanded section 45–452 to allow those with such decreed or appropriative rights to irrigate their lands with surface water, it was necessary for the legislature to delete the implicit prohibition against such landowners irrigating with any "water." *Id.* Thus, the legislature amended the statute to specify that landowners with grandfathered irrigation rights could irrigate their land with any "groundwater, effluent, diffused water on the surface or surface water," while those with pre-June 8, 1980, decreed or appropriative rights could irrigate their lands only with surface water. *Id.* In other words, the legislative purpose of this amendment was to add the irrigation exception for those with pre-June 8, 1980 decreed or appropriative rights and to explicitly designate the only water source (surface water) available to such landowners. Consequently, the legislature's insertion of the word "effluent" in the amendment to section 45–452 does not support the Association's argument that the legislature therefore intended to place effluent beyond the reach of those groundwater conservation statutes that were not similarly amended.

## IV. CONCLUSION

We conclude that the Groundwater Code authorizes the Department to count recovered effluent in determining municipal compliance with groundwater GPCD and the groundwater conservation requirements for municipal water distribution systems. We also conclude that the Arizona Supreme Court's decision in *Long* does not control this case and that counting recovered effluent is not the same as regulation of effluent.

For the above reasons we reverse.

WEISBERG, P.J., and CONTRERAS, J., concur.