990 P.2d 1080

Doris HARVEST, on behalf of herself and as mother and Reginald Lee Moore, the father of the Decedent Baby Doe Harvest, Plaintiffs–Appellants.

v.

Michael T. CRAIG, M.D. and Jane Doe Craig, husband and wife; Medical Environments, Inc., a foreign corporation, d/b/a Bullhead Community Hospital, Defendants–Appellees.

No. 1 CA–CV 97–0579.

Court of Appeals of Arizona, Division 1, Department C.

May 11, 1999.

Review Denied Nov. 30, 1999.

Law Offices of David W. Hume By: David W. Hume, Phoenix, Attorneys for Plaintiffs–Appellants.

Mitten, Goodwin & Raup By: Stephen C. Yost, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

SULT, Judge.

¶ 1 Doris Harvest and her boyfriend, Reginald Moore, ("appellants") filed a complaint for wrongful death based on medical malpractice against Dr. Michael Craig, his wife, and Medical Environments, Inc., d/b/a Bullhead Community Hospital ("appellees"). The trial court granted summary judgment in favor of appellees, finding that appellants failed to establish their malpractice claim under the clear and convincing standard required under Arizona Revised Statutes Annotated ("A.R.S.") section 32–1473 (Supp.1997). On appeal, appellants challenge section 32–1473 on several bases. We address only one issue, finding that appellees failed to establish their entitlement to the statute's enhanced standard of proof. We therefore reverse and remand for further proceedings.

## BACKGROUND

¶ 2 In 1992, appellants moved from Las Vegas to Laughlin, Nevada. The following year, Ms. Harvest became pregnant, and during the pregnancy, she returned to Las Vegas on a monthly basis to obtain prenatal care from Drs. Joseph and Kirsten Rojas.

¶ 3 On the evening of January 28, 1994, approximately thirty-five weeks into the pregnancy, Ms. Harvest experienced one to two contractions and felt "something very hot" in her abdominal region. After discharging a substantial amount of blood vaginally, she called 911.

¶ 4 When the paramedics arrived at the scene, they observed several blood clots which were approximately three to five centimeters in size. They also observed 50–75 ccs. of bloody discharge, and transported Ms. Harvest to the Bullhead Community Hospital emergency room, where she was examined by Michael Craig, M.D., an emergency-room physician. The paramedics reported the blood clots and bloody discharge to Dr. Craig and, according to Dr. Craig, he took a history from Ms. Harvest. According to Ms. Harvest, however, no one, including Dr. Craig, asked her about her prenatal history.

¶ 5 Ms. Harvest had the following risk factors, of which Dr. Craig did not become aware: she smoked and occasionally consumed alcohol during the pregnancy; she had undergone two abortions; she was treated for infections during the pregnancy; and she had a history of precipitous deliveries. Ms. Harvest did inform Dr. Craig about the blood clots and bloody discharge, but he found "no blood visible on vaginal exam and no sign of vaginal bleeding or cervical bleeding." Consequently, Dr. Craig concluded that Ms. Harvest had merely undergone a "bloody show," which is the first stage of labor involving the vaginal discharge of the mucus plug.

¶ 6 Dr. Craig telephoned Dr. Kirsten Rojas and reached her at her home in Las Vegas. He explained that Ms. Harvest was in the emergency room, thirty-five weeks pregnant, in the first stage of labor, and that her vital signs and fetal heart rate were within normal ranges. While he also told Dr. Rojas about what he believed to be the "bloody show," he failed to tell her about the blood clots and the blood loss. Dr. Craig indicated that Ms. Harvest appeared to be stable and recommended sending her home. Dr. Rojas responded that her hospital's protocol required that Ms. Harvest come to the Valley Hospital Medical Center in Las Vegas for monitoring and evaluation, and Dr. Craig indicated he would send Ms. Harvest there.

¶ 7 Before Ms. Harvest left about midnight, Dr. Craig twice reexamined her and found no substantial change in her condition. Ms. Harvest and Mr. Moore then began the two and one-half hour drive to Las Vegas. En route, Ms. Harvest experienced excruciating contractions and intense pain, and began bleeding again. This was later diagnosed as a placental abruption, which is the

premature separation, complete or partial, of a normally implanted placenta from the uterus. Ms. Harvest arrived at the Valley Hospital Medical Center approximately an hour later, and thereafter delivered a stillborn fetus.

¶ 8 Appellants filed a complaint against Dr. Craig and the hospital alleging wrongful death based on medical malpractice. The essence of the malpractice claim was that Dr. Craig misdiagnosed Ms. Harvest's abruption as a "bloody show," and as a consequence of this misdiagnosis, inappropriately allowed her to drive to Las Vegas. Appellees moved for summary judgment arguing, *inter alia,* that appellants could not prove their malpractice claim by "clear and convincing evidence" pursuant to section 32–1473. In agreeing that the statute was applicable and that appellants had failed in their burden, the trial court found that

> Dr. Craig appears to have done about all he could do under the circumstances and that was to make a telephone call to plaintiff's OB–GYN in Las Vegas in the middle of the night, and discuss as best he could, plaintiff's conditions with her treating physician.

Based on this conclusion, the trial court granted summary judgment to appellees, and appellants timely appealed.

### ISSUES

¶ 9 Appellants raise several issues in connection with section 32–1473, including whether it violates the anti-abrogation clause, the privileges or immunities clause, or the local or special law clause of the Arizona Constitution. However, the issue that we consider dispositive, and that makes it unnecessary to address the constitutional issues, is whether the trial court erred in finding that appellees proved that section 32–1473 was applicable to the facts of this case.[1]

### ANALYSIS

¶ 10 Prior to 1990, the standard of proof in Arizona for all medical malpractice claims

sounding in negligence was the same as for any other negligence action, namely proof by a preponderance of the evidence. *See Thompson v. Sun City Community Hospital, Inc.,* 141 Ariz. 597, 608, 688 P.2d 605, 616 (1984). In 1990, however, the Arizona legislature enacted section 32–1473, which carved out an exception for a certain type of medical malpractice action and imposed a higher standard of proof for such claims. The statute provides in relevant part:

> A. Unless the elements of proof contained in section 12–563 [the medical malpractice statute] are established by clear and convincing evidence, a physician licensed to practice pursuant to this chapter ... is not liable to the pregnant female patient [or] the child or children delivered ... for medical malpractice related to labor or delivery rendered on an emergency basis if the patient was not previously treated for the pregnancy by the physician....
>
> B. Unless the elements of proof contained in section 12–563 are established regarding the acts or omissions of a licensed health care facility or its employees in cases covered by the provisions of subsection A of this section by clear and convincing evidence, the health care facility is not liable to the female patient, the child or children delivered or their families for medical malpractice related to labor or delivery.
>
> C. This section does not apply to treatment rendered in connection with labor and delivery if the patient has been seen regularly by or under the direction of ... a licensed physician from whom the patient's medical information is reasonably available to the physicians attending the patient during labor and delivery.

Under this statute, if the pertinent circumstances described in subsection (A) or (B) exist, and the exception described in subsection (C) is not met, a person suing a hospital or physician in connection with emergency labor or delivery of a child must show by clear and convincing evidence that the hospi-

---

1. *See School District No. 26 of Yuma County v. Strohm,* 106 Ariz. 7, 9, 469 P.2d 826, 828 (1970) (courts do not decide cases on constitutional bases unless absolutely necessary to determine the merits of the action).

tal or physician fell below the applicable standard of care.

¶ 11 In this case, the issue is whether appellees proved an entitlement to the statute's enhanced standard of proof. In addressing this issue, we must first ascertain what it is precisely that the statute requires appellees to prove. The specific question presented here then, and the one we resolve, is the proper allocation of the various burdens of proof arising from this statute.[2]

¶ 12 Appellees admit to an initial burden of demonstrating the statute's applicability, but argue that all they must show are the circumstances described in subsection (A) for the doctor, or subsection (B) for the hospital. That is, appellees assert that upon showing that Ms. Harvest presented with an emergency labor, and that Dr. Craig had never previously treated her, appellees have established their entitlement to the enhanced standard of proof.

¶ 13 Appellants do not dispute that appellees satisfied subsections (A) and (B), but counter that the evidence fails to show that Ms. Harvest's prior medical information was not reasonably available to Dr. Craig, the showing that is required by subsection (C). Although appellants argue unartfully, it appears that they assert that appellees have the burden of satisfying subsection (C) as well as subsections (A) and (B) if they wish to have the advantage of the statute.[3]

¶ 14 Generally, when a statute grants a right or benefit, a court looks first to the statute to determine whether the legislative body has allocated the burden of proving entitlement to the right or benefit. *Steadman v. SEC*, 450 U.S. 91, 95–96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). When, as here, the statute is silent on the issue, we

must resort to other principles of construction. One leading authority teaches that no single overriding principle controls the decision. Rather, the allocation of a burden of proof depends, *inter alia*, on what is fair, what is convenient, who is seeking to change the status quo, and policy considerations such as those disfavoring certain defenses. McCORMICK ON EVIDENCE § 337, at 432 (J. Strong ed., 4th ed.1992).

¶ 15 In addition to this generic approach described in McCORMICK, other more specific rules have developed in the case law that formularize and simplify the process of ascertaining and allocating the burden of proof. For example, it is generally held that a party seeking a right or benefit under a statute bears the burden of proving that he comes within the ambit of the statute. *Baca v. Bueno Foods*, 108 N.M. 98, 766 P.2d 1332, 1336 (N.M.App.1988); *see generally* JONES ON EVIDENCE § 3:28, at 272 (Clifford S. Fishman ed., 7th ed.1992). However, where the statute grants a benefit but also contains an exception to the benefit, *and* the exception does not appear in the portion of the statute granting the benefit but appears in another clause of the statute, the party seeking the benefit of the exception has the burden of proving its entitlement thereto. *See* A.M. Swarthout, Annotation, *Burden of Allegation and Proof in Civil Cases as Regards Exception in Statute*, 130 A.L.R. 440, 478–79 (1941); *cf. Black, Robertshaw, Frederick, Copple & Wright, P.C. v. United States*, 130 Ariz. 110, 114, 634 P.2d 398, 402 (App.1981) (when statute required filing of a financing statement for assignment of accounts receivable, assignee who failed to plead and prove the filing exception in statute for assignment of "insignificant" portion of account could not prevail over perfected tax lien).

---

**2.** The trial court found on the undisputed facts presented to it in the summary judgment proceedings that appellees had proved an entitlement as a matter of law. We review *de novo* the issue of law presented, as well as whether the facts in the record support the trial court's conclusion. *Gonzalez v. Satrustegui*, 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993). If there are differing inferences to be drawn from the facts, we choose the inference favorable to appellants. *Id.*

**3.** At this point, we note that appellants do not explain whether the hospital is included in this action solely for its vicarious liability, or whether the hospital is accused of independent acts of malpractice. The answer is irrelevant for purposes of this decision, however, because subsection (B) of section 32–1473 grants the same benefit of an enhanced standard of proof to hospitals as subsection (A) does to physicians. Therefore, subsection (A) applies to benefit the hospital if vicarious liability is sought, and subsection (B) applies if independent negligence is alleged.

¶ 16 Section 32–1473 appears to be amenable to a construction using this allocation rule because subsections (A) and (B) grant the benefit of the heightened standard of proof but do not contain any exception to its applicability. Rather, the exception to application of subsections (A) and (B) appears in a different part of the statute, namely subsection (C). Thus, an uncritical and mechanical use of the allocation rule would require that appellants be allocated the burden of proving all the circumstances described in subsection (C) if they are to avoid the application of subsections (A) and (B) to their claim.

¶ 17 We disagree, however, that we should proceed in such fashion. Rather, we conclude that we should examine subsection (C) to determine what showing is required, and then apply the McCormick factors to decide who should make that showing. This approach is more likely to result in an allocation that is appropriate, and we think the factors of fairness, convenience, and change in the status quo should be the paramount considerations in our analysis.

¶ 18 The first requirement of subsection (C) is that the expectant mother have been under the care of a licensed physician for the pregnancy. Whether that is the case is something peculiarly within the mother's knowledge and is information that can easily and quickly be communicated to a physician attending an emergency labor or delivery. We therefore conclude that it is both fair and convenient to place the burden of proving this fact on the mother. *See Woerth v. City of Flagstaff,* 167 Ariz. 412, 419, 808 P.2d 297, 304 (App.1990) (when proof of an assertion is peculiarly within the knowledge of a party, the burden of producing evidence of that assertion is properly assigned to that party).

¶ 19 The second requirement of subsection (C) is that the mother's medical information be reasonably available from her physician. In the context of an emergency presentation at a hospital, it is not likely to be the distressed mother who will attempt to contact her regular physician. This job properly belongs to the attending medical personnel, who are the ones that need the mother's medical information and are in the best position to put it to proper use. Thus, the question whether the mother's medical information is reasonably available is more likely to be answerable by the attending medical personnel than by the mother. This fact militates in favor of assigning the burden of proving the second requirement to the physician and the hospital, on the basis that it is both convenient and fair to do so.

¶ 20 We also note that section 32–1473 is in derogation of the common-law rule regarding the standard of proof for a negligence claim. In other words, the statute changes the status quo, and by seeking the benefit of the statute, the physician or hospital thereby also seeks to change the status quo. This additional factor further justifies allocating the burden of proving reasonable availability to the physician or hospital.[4]

¶ 21 Applying the relevant McCormick factors, then, we conclude that appellants had the burden of proving Ms. Harvest's prenatal care by a licensed physician, which she indisputably did prove. We further conclude that appellees had the burden of proving Ms. Harvest's medical information was not reasonably available from her physician. We turn now to the record to determine whether appellees met this burden.

¶ 22 Dr. Craig obtained the name of Ms. Harvest's prenatal care physician, Dr. Rojas, and did in fact reach her at her home in Las Vegas. Because it was evening and she was at home, Dr. Rojas did not have access to Ms. Harvest's medical chart. What the record shows with respect to their conversation is that Dr. Craig informed Dr. Rojas of some, but not all, of his findings, and

---

4. While we do not address the constitutional issues, we nevertheless observe that in carving out a special benefit for one type of emergency situation, and imposing a special burden for one class of malpractice claimants, section 32–1473 comes within that type of legislation that is generally disfavored by the principle of equality under the law. Thus, applying the McCormick policy factor regarding disfavored claims, he who would benefit from this type of statute should properly have the burden of proving entitlement, which in this case would include proof of the reasonable availability of medical information.

recommended that Ms. Harvest be sent home.

¶ 23 What the record does not establish is that Dr. Craig ever inquired of Dr. Rojas about Ms. Harvest's medical history. Dr. Craig does not affirmatively assert that he did inquire, and Dr. Rojas testified in deposition that she did not convey the history to Dr. Craig. From these circumstances, we can infer that Dr. Craig did not seek any medical history from Dr. Rojas. We also note that when contacted by Dr. Craig, Dr. Rojas remembered Ms. Harvest and knew that she was not quite to term. This tends to indicate that even though Dr. Rojas was at home, she might have if asked been able to convey pertinent information which could have impacted the subsequent decisions made by Dr. Craig.

¶ 24 The trial court apparently based its ruling that medical information was not reasonably available solely on the fact that Dr. Rojas was at home, without immediate access to Ms. Harvest's medical records. While it is not necessarily unreasonable to draw such an inference, our analysis demonstrates that the contrary is also reasonably inferable; namely, that Dr. Rojas could have, if asked, conveyed pertinent medical information to Dr. Craig. In light of these competing inferences, it cannot be said that appellees sustained their burden of showing that Ms. Harvest's medical information was not reasonably available. *See Republic Insurance Co. v. Feidler*, 178 Ariz. 528, 534, 875 P.2d 187, 193 (App.1993) (in the face of competing reasonable inferences, summary judgment is not proper). Therefore, we conclude that appellees did not establish their entitlement to the enhanced burden of proof granted by section 32–1473, and the trial court erred in so holding.

## CONCLUSION

¶ 25 Because the trial court erred in applying a clear and convincing standard to appellants' claim, and because we cannot say on this record as a matter of law that appellants' claim failed to meet the preponderance of the

evidence standard, we reverse the trial court's grant of summary judgment to appellees and remand the case for further proceedings.[5]

CONCURRING: SARAH D. GRANT, Presiding Judge, and SUSAN A. EHRLICH, Judge.

---

5. Appellants also raised a discovery issue concerning late disclosure by appellees of affidavit testimony supporting their motion for summary judgment. We need not address this issue because it will be moot on remand.