Jose Juan Rodriguez GUARDAS,
a single man, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Case No. 05–CV–681–TUC–JMR.

United States District Court,
D. Arizona.

Feb. 18, 2009.

Arthur G. Newman, Cindy H. Strickland, John Aguirre, Thomas M. Ryan, Treon Aguirre & Newman PA, Phoenix, AZ, for Plaintiff.

Robert L. Miskell, U.S. Attorneys Office, Tucson, AZ, for Defendant.

## ORDER

JOHN M. ROLL, District Judge.

Plaintiff Jose Juan Rodriguez Guardas is an undocumented alien who received life-threatening injuries when U.S. Border Patrol Agent Octavio Arvizu discharged his firearm. Plaintiff's amended complaint alleged both Federal Tort Claims Act ("FTCA") and *Bivens*[1] claims, but prior to trial, the *Bivens* claim was dismissed. On October 20–23, 2008, a four-day bench trial on Plaintiff's two FTCA claims, alleging negligence in Count One and assault and Battery in Count Two, was held. In Count One, Plaintiff alleges that Agent Arvizu negligently and unintentionally discharged his firearm. Agent Arvizu contends that the firearm was intentionally and justifiably discharged. In Count Two, Plaintiff alleges, alternatively, that if the firearm was intentionally discharged, it occurred without justification and an assault and battery had occurred.

Upon the conclusion of trial, and pursuant to Court order, the parties submitted proposed findings of fact and conclusions of law. Upon review of the entire record, the Court finds in favor of the Defendant as to both counts, and pursuant to Federal Rule of Civil Procedure 52(a), sets forth its findings of fact and conclusions of law below. To the extent these findings of fact are also deemed to be conclusions of law, they are hereby incorporated into the conclusions of law that follow.

### Findings of Fact

The parties have stipulated to the following facts in their Joint Pretrial Order, and the Court herein adopts these facts:

1. Agent Octavio Arvizu shot Jose Juan Rodriguez Guardas in the face at close range with a .40 caliber Beretta handgun.

2. Plaintiff was unarmed at the time of the shooting.

3. Plaintiff was an alien illegally in the United States at the time of the incident.

4. Plaintiff had been removed from the United States 22 times prior to the incident.

5. At the time of the incident, Plaintiff was committing the crime of knowingly transporting illegal aliens, in violation of 8 U.S.C. § 1324.

6. Agent Octavio Arvizu was in an unmarked Border patrol SUV at the time of the incident/stop.

7. Three Border Patrol agents were present at the time of the stop of the vehicle driven by Plaintiff and at the time of the shooting.

8. Agent Peter Mariles, a partner of Agent Arvizu, approached the passenger side of Plaintiff's vehicle and did not draw his weapon that day.

9. Agent Arvizu struck the driver's side window of the vehicle with his baton which was in his right hand.

10. Agent Arvizu's gun was in his left hand at the time of the shooting.

11. Border Patrol Agent Carlos Zayas was in the second Border Patrol vehicle at the stop and approached the Plaintiff's vehicle toward the rear of the vehicle at the time of the shooting.

12. Plaintiff was driving within the speed limit at all times of the pursuit.

13. Plaintiff stopped his vehicle within two miles from the point the agents first decided to attempt to stop his vehicle.

### The Pursuit

14. Shortly before noon on October 3, 2004, United States Border Patrol Agents Octavio Arvizu, Peter Mariles, and Carlos

---

1. Plaintiff's *Bivens* claim sought damages for alleged deprivation of constitutional rights under *Bivens v. Six Unknown Agents of Feder-* *al Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Zayas parked their vehicles along eastbound Charleston Road near the San Pedro River, at or near Milepost 12. They parked two vehicles—an unmarked Border Patrol white Dodge Durango, and a fully marked Border Patrol sedan. (Exhibit 145; RT 10/20/08–10/21/08, Testimony of Arvizu and RT 10/22/08, Testimony of Mariles.) [2]

15. Agent Arvizu was highly experienced with firearms and was an expert shot. (R/T 10/20/08–10/21/08, Testimony of Arvizu.)

16. While at that location, the three Border Patrol agents observed a 1994 green Camaro slowly pass their location. Plaintiff was the driver of the vehicle. The agents noted that although the vehicle passed at a speed that seemed unusually slow, neither Plaintiff nor the front passenger glanced toward the agents. One of the agents commented that the Camaro "looked like a good one," indicating that the vehicle was either carrying illegal aliens or drugs. (R/T 10/20/08–10/21/08, Testimony of Arvizu, R/T 10/21/08, Testimony of Zayas, and R/T 10/22/08, Testimony of Mariles.)

17. Agents Arvizu and Mariles began following Plaintiff's vehicle. The agents were in an unmarked white Dodge Durango, while Agent Zayas followed in a marked Border Patrol vehicle. After catching up with Plaintiff's vehicle, Agent Arvizu activated the emergency lights and the siren on the Durango. (R/T 10/20/08, Testimony of Arvizu.)

18. Meanwhile, an ambulance passed Plaintiff's vehicle on the roadway, but Plaintiff did not pull to the side. (R/T 10/20/08, Testimony of Arvizu.)

19. Agent Arvizu could see Plaintiff looking into his rear-view mirror. Plaintiff

failed to respond for approximately 30 seconds, before finally pulling to the side of the highway. Although Plaintiff could have pulled to the side of the road where desert was located and into which the occupants could have run, the place where Plaintiff ultimately stopped was next to a guardrail. Agent Arvizu viewed this position as dangerous, because Plaintiff's vehicle could be placed in reverse and used to pin or otherwise injure the agents. When Plaintiff's vehicle stopped, no one exited Plaintiff's vehicle. (R/T 10/20/08, Testimony of Arvizu.)

20. There is much alien smuggling activity in southern Arizona and, typically, smugglers and aliens "bail out" of vehicles and try to escape. The fact that no one in the vehicle bailed out further raised Agent Arvizu's suspicions. (R/T 10/20/08, Testimony of Arvizu.)

### The Stop

21. Agent Arvizu used his loudspeaker to tell Plaintiff, both in English and Spanish, to open the driver's side window. Plaintiff did not comply. (R/T 10/20/08, Testimony of Arvizu.)

22. Agent Arvizu ran to the driver's side of the Camaro. Three individuals were leaning over in the backseat, in an apparent attempt to conceal their presence. Agent Mariles, who approached the Camaro from the rear passenger side, observed these individuals hunched over in the backseat, and announced "bodies," indicating that alien smuggling was taking place. (R/T 10/20/08, Testimony of Arvizu and R/T 10/22/08, Testimony of Mariles.)

23. The Camaro contained five individuals total, including Plaintiff, Plaintiff's brother, who was the front seat passenger, and Plaintiff's wife, who was in the backseat. Two other individuals, brothers-in-

---

**2.** Pinpoint cites to the trial are not yet available because no final transcript has been prepared. Citations are based upon the court

reporter's unedited realtime notes, and are to the date of testimony.

law of Plaintiff's brother, were also seated in the backseat. None of the vehicle's five occupants were lawfully in the United States. (R/T 10/22/08, Testimony of Guardas.)

24. Agent Arvizu tried to open the driver's door, but it was locked. He directed Plaintiff, in Spanish, to show his hands, raise his hands toward the roof, open the window, and open the door. Plaintiff failed to comply with any of Agent Arvizu's commands. Agent Arvizu, with his baton in his right hand and his firearm in his left hand, then struck the window with his baton. (R/T 10/20/08, Testimony of Arvizu and R/T 10/21/08, Testimony of Zayas.)

25. Simultaneously, Plaintiff turned to his right and reached down toward his right hip, toward the center console of the Camaro. Agent Arvizu saw a shiny, metallic object in the general area to which Plaintiff was leaning, and intentionally fired his weapon at Plaintiff. The bullet from Agent Arvizu's firearm traveled through the car window and hit Plaintiff's jaw. (R/T 10/20/08, Testimony of Arvizu and R/T 10/21/08, Testimony of Watkins.)

26. Unintentional discharges of a .40 caliber Beretta handgun are rare (R/T 10/21/08, Testimony of Patrick.)

27. At the time the shooting took place, Plaintiff was wearing a large belt with elaborate silver ornamentation that covered and extended all the way around the belt. (Exhibit 2; R/T 10/20/08–10/21/08, Testimony of Arvizu.)

28. Plaintiff's belt measures 42 inches by 1.5 inches. *See* Exhibits A, B, and C attached to the Court's opinion.[3]

### Aftermath

29. After Agent Arvizu discharged his weapon, Plaintiff was taken from the vehi-

cle. Plaintiff described holding his hands under his chin to keep his chin in place. He spit out teeth that were dislocated due to the bullet's path. (R/T 10/22/08, Testimony of Guardas.) Agent Arvizu swore at Plaintiff, asking Plaintiff why he hadn't raised his hands and opened the door when Agent Arvizu had requested. (R/T 10/20/08, Testimony of Arvizu and R/T 10/21/08, Testimony of Zayas.) Agent Arvizu explained to Plaintiff that he hadn't wanted to shoot Plaintiff. Arvizu also testified that immediately after the shooting, he told Plaintiff that he thought Plaintiff's belt was a gun, and, because of Arvizu's statement, the Cochise County Sheriff's Office treated Plaintiff's belt as an item of evidence on the day of the shooting. (Exhibit 5; R/T 10/20/08–10/21/08, Testimony of Arvizu).

30. Plaintiff was air-evacuated to the University Medical Center in Tucson. At the hospital, while receiving treatment for the massive injuries received, Plaintiff stated that Agent Arvizu told Plaintiff that Arvizu had thought Plaintiff had a gun. In addition, Agent Zayas testified that Agent Arvizu, after the shooting, said that Arvizu thought Plaintiff had a gun. Although Agent Arvizu was not interviewed until four days after the shooting, during that interview, he indicated that he thought Plaintiff had a gun. (R/T 10/20/08–10/21/08, Testimony of Arvizu and R/T 10/21/08, Testimony of Zayas.)

31. Plaintiff sustained extensive, profound injuries to his jaw, lips, and teeth, including bone loss to his mandible, teeth displacement, lower lip soft tissue injury, and damage to the mandibular labial vestibule (area underneath the tongue). (R/T 10/23/08, Testimony of Carlotti.)

---

**3.** Exhibits A, B, and C are photographs of Exhibit 2. These photographs were taken by a

photographer at the U.S. District Court.

## Conclusions of Law

### A. Negligence Claim

 1. Pursuant to the Federal Tort Claims Act, "suits against the United States are governed by the substantive law of the place where the act or omission complained of occurs." *McMurray v. U.S.*, 918 F.2d 834, 836 (9th Cir.1990). In this case, that place is Arizona, and thus Arizona law applies.

 2. "Further, the burden of proving negligence . . . never shifts but rests at every stage of the case upon the party alleging it." *Pickwick Stages Corp. v. Messinger*, 44 Ariz. 174, 36 P.2d 168, 171 (1934); *see also Berne v. Greyhound Parks of Arizona, Inc.*, 104 Ariz. 38, 448 P.2d 388, 389 (1968) ("The burden of proving negligence rests upon the plaintiff, and it is not incumbent upon the defendant to prove an absence thereof.").

 3. The elements of negligence are a duty on the part of the defendant to protect the plaintiff, a failure of the defendant to perform that duty, and an injury to the plaintiff that was proximately caused by that failure. *Johnson v. Harris*, 23 Ariz.App. 103, 530 P.2d 1136, 1138 (1975). Negligence must be proven by a preponderance of the evidence. *Harvest v. Craig*, 195 Ariz. 521, 990 P.2d 1080, 1082 (1999).

### B. Battery Claim

 1. A claim of battery under Arizona law requires the plaintiff to prove that the defendant intentionally caused a harmful or offensive contact with the plaintiff. *Johnson v. Pankratz*, 196 Ariz. 621, 2 P.3d 1266, 1268 (Ariz.Ct.App.2000) (citing Restatement (Second) of Torts § 13 (1965)).

2. However, also under Arizona law, the use of deadly force by a peace officer against another person is justified when the peace officer reasonably believes that the use of such force is necessary in order to defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force. Ariz.Rev.Stat. § 13–410(C).

 3. The reasonableness of "a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 396–97, 109 S.Ct. 1865.

### Ruling of the Court

 First, the Court finds that Agent Arvizu intentionally shot Plaintiff upon seeing Plaintiff's belt, which Agent Arvizu reasonably believed under the circumstances to be a firearm. The Court finds Agent Arvizu's testimony credible in this regard. Further, statements made by Agent Arvizu at the scene provide support for this finding. These statements include Agent Arvizu's declaration that he thought the belt was a gun, and his questions to Plaintiff regarding why Plaintiff had not followed Arvizu's instructions. In addition, the Cochise County Sheriff's Office treated Plaintiff's belt as an item of evidence on the day of the shooting, and this indicates that Arvizu has repeatedly and consistently stated, since the day of the shooting, that he thought the belt was a gun. Also, the fact that Agent Arvizu was highly experienced with firearms and was an expert shot, vastly decreases the likelihood that the shot was unintentional. Finally, unintentional discharges of a .40 caliber Beretta handgun are rare.

**1064**

Because Plaintiff has failed to prove that Agent Arvizu's discharge of the firearm occurred as a result of negligence, the Court thus finds for the Defendant on Plaintiff's claim of negligence.

■ Second, the Court finds that the evidence proves that Agent Arvizu's use of force was justified, in that he reasonably believed—in the split second in which he was forced to react—that Plaintiff possessed a firearm and was preparing to use it against Agent Arvizu. The circumstances surrounding the discharge, including Plaintiff's failure to stop immediately when pursued by the agents, Plaintiff ultimately stopping next to a guardrail, Plaintiff's transporting of passengers visibly trying to conceal themselves, and Plaintiff's disregard of Agent Arvizu's commands to raise his hands, open the window, and open the door, instead bending toward the center console of the Camaro, and thereby exposing a bright silver object to Agent Arvizu, all were indications of danger to the agent.

In addition, the design of the belt itself lends strong support to Agent Arvizu's belief that it was a gun. The belt is completely covered with shiny metallic studs, which shine brightly when subjected to light.

Having reviewed all the evidence, the Court finds that Agent Arvizu's perception that Plaintiff had a gun was reasonable, and that Agent Arvizu was therefore justified in shooting the defendant.

The Court thus finds for the Defendant on the Plaintiff's claim of assault and battery.

Accordingly,

**IT IS HEREBY ORDERED** that **JUDGMENT** be entered for Defendant on Plaintiff's claim of negligence, and **JUDGMENT** be entered for Defendant on Plaintiff's claim of assault and battery.

The Clerk shall enter judgment accordingly.