73 P.3d 1267

**ARIZONA WATER COMPANY, an Arizona corporation, Plaintiff–Appellee, Cross Appellant,**

v.

**ARIZONA DEPARTMENT OF WATER RESOURCES; N.W. Plummer, in his capacity as Director of the Arizona Department of Water Resources, Defendants–Appellants, Cross Appellees,**

Arizona Corporation Commission, Intervenor–Appellee.

No. 1 CA–CV 02–0276.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 12, 2003.

Irvine, J., concurred in part and dissented in part with opinion.

Arizona Department of Water Resources
by W. Patrick Schiffer, Kenneth C. Slowin-

**534**

ski, Wilbert J. Taebel, Phoenix, Attorneys for Appellants–Cross Appellees.

Fennemore Craig by Timothy Berg, Norman D. James, Thomas R. Wilmoth, Phoenix, Attorneys for Appellee–Cross Appellant.

Robert W. Geake, Phoenix Co–Counsel for Appellee–Cross Appellant.

Arizona Corporation Commission by Janet F. Wagner, Phoenix, Attorney for Intervenor–Appellee.

Ryley Carlock & Applewhite, P.A. by Michael J. Brophy, L. William Staudenmaier, Phoenix, Attorneys for Amicus Curiae.

## OPINION

SULT, Presiding Judge.

¶ 1 This action for judicial review arises from a decision of the Director of the Arizona Department of Water Resources approving the conservation measures contained in the Department's second management plan, a plan promulgated by the Department in accordance with its mandate in Arizona's Groundwater Code to manage the extraction, distribution, and use of groundwater. *See generally* Arizona Revised Statutes ("A.R.S.") §§ 45–401 to 45–724 (2003). According to appellants, the Department and its Director, the plan did not need to include conservation measures specifically applicable to "end users" of groundwater, a term that the parties use to describe the customers of municipal and private water providers.

¶ 2 Appellee Arizona Water Company held a different opinion of the Department's statutory mandate and petitioned the superior court to review the Director's decision. The superior court agreed with Arizona Water that the relevant Code provisions should be interpreted to require the Department to include end users in the management plan's conservation scheme. Because the plan did not do so, the court vacated the plan, remanded the matter to the Department to draft an amended plan, and awarded Arizona Water its attorneys' fees.

¶ 3 The Director and the Department appealed the decision to this court. We agree with the superior court that the legislature intended that the Department include in its management plans conservation measures applicable to end users. However, we do not

find a sufficient basis in the record to sustain the award of attorneys' fees and remand that issue for further proceedings.

## BACKGROUND

¶ 4 In 1980, the Arizona Legislature determined that the state's groundwater supply was at such risk that state-imposed measures aimed at its preservation were necessary. A.R.S. § 45–401(A). To that end, the legislature enacted Arizona's Groundwater Code which declared it to be the policy of the state "to conserve, protect and allocate the use of groundwater resources of the state and to provide a framework for the comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater in this state." A.R.S. § 45–401(B). The Department and its Director were assigned the principal task of implementing the comprehensive regulatory scheme set out in the Code. A.R.S. §§ 45–103(B), 45–105(B)(2).

¶ 5 Certain areas of the state were designated as active management areas, meaning that extractors, transporters, and users of groundwater were subject to special regulations. *See* A.R.S. § 45–402(2). These regulations, called management plans, were to include measures designed, in the case of the Tucson, Phoenix and Prescott active management areas, to decrease the mining of groundwater and achieve safe yield by the year 2025. A.R.S. § 45–562(A). Specifically, the plans were to include "a continuing mandatory conservation program for all persons withdrawing, distributing or receiving groundwater designed to achieve reductions in withdrawals of groundwater." A.R.S. § 45–563(A).

¶ 6 The management plans for each active management area were to cover successive ten-year periods, and the first plan for the Phoenix area was for the period 1980–1990. A.R.S. § 45–564(A). By statute, the first plan was required to include "[a] conservation program for all non-irrigation uses of groundwater." A.R.S. § 45–564(A)(2). The users of water supplied by municipal providers, which category includes private water companies like Arizona Water, were subject to "reasonable reductions in per capita use

and such other conservation measures as may be appropriate for individual users." *Id.* Arizona Water did not challenge the first management plan.

¶ 7 In December 1989, pursuant to the statute governing plans for the second management period, the Director adopted a 1990–2000 plan for the Phoenix active management area. A.R.S. § 45–565. The second plan built on the goals for reduction in groundwater use outlined in the first plan and provided that cumulative to the reductions achieved during the first management period, the second plan should require "additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users." A.R.S. § 45–565(A)(2).

¶ 8 To accomplish this directive, the Department in its second plan continued its primary program for achieving reductions in groundwater usage. This program is called the "Total Gallons Per Capita Per Day" program, which the parties refer to by its acronym GPCD, and the Department established a GPCD program for each active management area. Each water system in a management area was assigned a GPCD rate, with that number representing the total gallons per day that a provider could deliver to each customer, with an additional goal of reduction in that rate as the ten-year period progressed. The actual implementation of the program is complex, and the details are not necessary for our decision. It is sufficient to note that in the second management plan, as well as in the third management plan now in effect, the entire onus of achieving reductions in groundwater usage is placed on the providers. The customers of the provider, the "end users," are not assigned any responsibility to engage in any conservation measures. Rather, the plan assumes that in order to meet the requirements under the plan, each provider will implement and enforce conservation measures upon its customers.[1]

¶ 9 In January 1990, Arizona Water filed an action in superior court for judicial review of the Director's action in approving second management plans for several of Arizona Water's water utility companies. The gist of the complaint was that the plans were not in compliance with the Groundwater Code because they did not include conservation measures to be imposed directly on end users. The proceeding was stayed pending the Director's administrative review of the plans, and throughout the next several years, Arizona Water and the Department settled their differences regarding all of these companies except Arizona Water's Apache Junction water utility.

¶ 10 The Director ultimately issued a decision substantially affirming the management plan's conservation measures, and Arizona Water filed a second complaint for judicial review in May 1999. The superior court consolidated this complaint with the earlier one and determined that it would be appropriate to involve the Arizona Corporation Commission in the proceedings because of its authority over public utilities. At the court's instance, the Commission intervened and filed a brief asserting that although the Department had no authority to tell a water utility whom to serve or whom to terminate, the Commission saw no irreconcilable conflicts as it often successfully worked with sister state agencies when overlapping regulatory issues arose.

¶ 11 Following further proceedings, the court on February 8, 2002 entered judgment: 1) vacating the portion of the second management plan as applied to Arizona Water's Apache Junction system because the plan failed to address water utilization by end users; 2) remanding the matter to the Department to address the deficiencies in the plan; and 3) awarding Arizona Water $137,900 in attorneys' fees.

¶ 12 The Department timely appealed to this court. Arizona Water timely cross-ap-

---

1. Although the second management plan has expired, the issue before this court is not moot because the municipal conservation requirements for the third management plan now in effect largely mirror the requirements challenged in the current litigation. Arizona Water has filed an action for review of the conservation requirements in the third management plan, which case is currently pending in Maricopa County Superior Court (Case No. CV2000–001700).

pealed, challenging as insufficient the trial court's award of attorneys' fees.

## ISSUES

■ ¶ 13 The central issue in this appeal is whether the legislature intended that in implementing the Groundwater Code's conservation mandate the Department should include in its management plans conservation measures to be employed by end users of groundwater. Assuming the superior court was correct on this point, the next issue is whether it properly awarded Arizona Water attorneys' fees under A.R.S. § 12-348(A)(2)(Supp.2002). The last issue is one presented to the superior court but not decided by it; namely, whether the Department is authorized to include Central Arizona Project water used by a provider in determining that provider's compliance with its total GPCD requirements. Although not required to address this issue, we elect to do so within our discretion because the parties have fully briefed it on appeal and a decision thereon will provide guidance in the future and preclude further litigation on the point. *See Jett v. City of Tucson*, 180 Ariz. 115, 123–24, 882 P.2d 426, 434–35 (1994).

## ANALYSIS

### Conservation Measures for End Users

■ ¶ 14 We have already alluded to several of the statutes in the Groundwater Code wherein the legislature has indicated what it expects to accomplish via the Code and how it intends this to happen. A more detailed examination of these statutes is appropriate in order to determine if the legislature has directed the Department to include in its management plans conservation provisions directly applicable to end users, or whether, as the Department contends, the responsibility to regulate end users can be delegated to the municipal providers.

¶ 15 We begin with the opening policy statement of the legislature wherein that body declared that the Code was designed to create a framework for the "comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use the groundwater in this state." A.R.S. § 45–401(B). That such management and regulation must include

conservation measures is indicated not only by the specific mention of conservation in the policy declaration but also by the language of A.R.S. § 45–492(A), one of the principal statutes implementing the policy. That statute conditionally grants to a municipal provider in an active management area "the right to withdraw and transport groundwater within its service area for the benefit of landowners and residents within its service area." It further conditionally entitles "the landowners and residents ... to use the groundwater delivered." A limiting condition imposed by the statute on the rights granted to the provider and its end users, however, is that these rights are "subject to ... (2) [c]onservation requirements developed by the director pursuant to article 9 [management plans] of this chapter."

¶ 16 While this language seems a clear indication that the legislature intended the Director to create conservation requirements both for providers and end users, one could argue that subsection (2) of § 45–492(A) should be read differently. Rather than requiring the Department to directly include explicit conservation measures for end users in its management plans, the requirement that end users be "subject to" the Director's conservation measures can be satisfied by the indirect method of requiring the provider to impose such measures on its customers. To determine whether this might be the legislature's intended meaning, we next consider the provisions of Article 9 dealing with what matters the Director must include in management plans.

¶ 17 Article 9, A.R.S. §§ 45–561 to 45–578, is principally concerned with the successive ten-year management plans that are intended to accomplish the Code's safe-yield goal in active management areas. For all management plans, A.R.S. § 45–563 requires "a continuing mandatory conservation program for all persons withdrawing, distributing or **receiving** groundwater" (emphasis added). For the first management plan, A.R.S. § 45–564(A)(2) mandated "[a] conservation program for all non-irrigation uses of groundwater" that "require[d] reasonable reductions in per capita use and such other conservation measures as may be appropriate **for individ-**

ual users" (emphasis added). For the second management plan, A.R.S. § 45–565(A)(2) decreed more conservation measures designed to achieve additional reductions in per capita use beyond those of the first management period and "use of such other conservation measures as may be appropriate **for individual users**" (emphasis added).

¶ 18 The Department asserts, and we acknowledge, that there is no specific statutory provision by which the legislature definitively ordered the Department to create and impose conservation measures for end users. However, it is difficult to read the provisions cited above and not develop a firm conviction that the legislature intended just that. Certainly, common sense dictates that if one is assigned the duty of conserving a limited resource like groundwater, one needs the authority, and must assume the corresponding responsibility, to manage the resource throughout its entire cycle, from extraction to transportation to consumption and even recharge. And if the manager is to obtain the desired conservation result, all those participating in the cycle must be managed directly in regard to their conservation responsibility, including the customer who uses the groundwater and not just the provider who extracts, transports, and delivers it to him.

¶ 19 It is crucial that legislative enactments be given a sensible construction. *Lake Havasu City v. Mohave County*, 138 Ariz. 552, 557, 675 P.2d 1371, 1376 (App. 1983). We believe that a finding that the Code requires the Department in its management plans to include conservation measures for end users is such a construction. The Department, however, disagrees, arguing that other provisions of the Code indicate that the legislature intended that the Department impose conservation measures on providers only, leaving to those providers the duty of compelling end users to conserve. We now address the Department's arguments, testing their sensibility quotient by examining the arguments in light of the statutory language cited in support.

¶ 20 The Department first references the notice provisions of the management plan statutes. In A.R.S. § 45–564(B), dealing with the first management plan, the legislature ordered the director to "give written notice of ... (2)[t]he municipal conservation requirements included in the management plan for reductions in per capita use and for the use of appropriate conservation measures by individual users **to each person who is entitled to withdraw or distribute groundwater for municipal use in the active management area**" (emphasis added). This notice requirement is repeated for successive management periods, with some modifications not relevant here. *See e.g.*, A.R.S. § 45–565(B) (second management period). According to the Department, "[i]f the legislature had intended for customers of providers to comply with GPCD requirements, it would have required [the Department] to give notice of the requirements to them and not to the providers."

¶ 21 The Department conflates its obligation to craft conservation measures for end users with its obligation to give notice of those measures. What the notice provisions are intended to accomplish is to relieve the Department of the burden of identifying and giving notice to hundreds of thousands of end users of the specific conservation measures applicable to them. Instead, these provisions transfer that notice obligation to the entity better able to accomplish the task, namely the end users' municipal provider. But requiring providers to give notice to end users of their required conservation measures is not equivalent to relieving the Department of the duty to create and impose these measures. The Department's contrary interpretation stretches the notice provisions beyond their intended meaning and we therefore reject that reading.

¶ 22 Another argument advanced by the Department derives from A.R.S. § 45–565.01 creating a **non**-per-capita conservation program for municipal providers. This type of program is a different approach from the per-capita method of groundwater mining reduction and is available to a provider who cannot effectively employ the per-capita approach to achieve conservation goals.

¶ 23 Subsection (E)(1) of A.R.S. § 45–565.01 permits the Director to approve a provider's application to use a non per-capita conservation program only if "[t]he municipal provider agrees in writing to implement spe-

**538**

cific conservation programs that will result in achieving water use efficiency in the municipal provider's service area equivalent to the water use efficiency that was assumed by the director in establishing the municipal provider's per capita conservation requirements pursuant to § 45–565. . . ." The Department argues that this provision shows that with respect to the per-capita programs, "the legislature intended the Director to **assume** a level of water use efficiency in a provider's GPCD requirement, but not require the provider to implement any **specific** measures."

¶ 24 We do not follow the Department's logic in connecting A.R.S. § 45–565.01 requiring providers to implement conservation measures in non-per-capita programs to provisions in the per-capita statutes that require the Department to create conservation measures for end users. We first note that there is no indication in the language of A.R.S. § 45–565.01 that the Department is relieved from creating the conservation measures that the provider will be required to implement. Thus, the statute seems irrelevant to the issue before us, namely, upon whom is the responsibility placed for crafting conservation measures.

¶ 25 We next note that simply because a municipal provider seeking to change to a non-per-capita program must agree to implement specific conservation measures, it does not follow that the Department did not have a prior responsibility to create and impose end-user conservation measures in that provider's prior per-capita program. The Department's assertion is not a commonsense construction of A.R.S. § 45–565.01 but instead a strained interpretation that the statutory language cannot support. In any event, the connection between A.R.S. § 45–565.01 and the statutes relating to per-capita programs, if any, is much too tenuous to warrant finding a legislative intent different from the aims we have discerned in the per-capita statutes.

¶ 26 As courts often observe, a legislature speaks its intent primarily through the language it employs in its enactments. *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993). When we are called upon to ascertain that intent, we naturally look to that language. *Id.* We have done so here, and, while we must agree with the Depart-

ment that the legislature did not expressly order inclusion of end-user conservation measures in the Department's management plans, that the legislature nevertheless so intended is the most reasonable conclusion to be drawn from its language. If the legislature's aim of creating a comprehensive management and regulation framework for all phases of the groundwater cycle is to be met, the entity charged with doing the managing and regulating, the Department, must meet its responsibility. We therefore affirm the superior court and direct that the Department and its Director return to the management plan drawing board and devise appropriate conservation measures for its management plan that include end users.

¶ 27 The Department has included other arguments related to this issue in its reply brief, apparently in response to its perception that Arizona Water is arguing in this appeal that not only must the Department include end users in the management plans but also that the Department has no authority to impose any conservation requirements directly on providers. We do not address these additional arguments because we do not read Arizona Water's response as asserting that providers should not be made subject to conservation measures promulgated by the Department in its management plans. We acknowledge that our dissenting colleague believes the issue is raised by Arizona Water and proceeds to analyze it, concluding that the legislature clearly intended that providers are to be included in the conservation measures required in management plans. *Infra*, ¶¶ 60–73. We treat Arizona Water's failure to raise the issue properly in this appeal as essentially a concession of this point. We note, however, that if we believed Arizona Water had properly raised the issue, we would respond to Arizona Water's contention precisely as has our dissenting colleague.

¶ 28 We also do not address Arizona Water's contention that imposition of conservation requirements somehow conflicts with a provider's obligations to the Arizona Corporation Commission as a regulated water utility. The Commission has intervened in this matter and filed separate briefs. In response to Arizona Water's suggestion that

satisfying its conservation obligations under a management plan could cause it to violate its public utility obligation to serve all customers on demand, the Commission informs us that it often reconciles its jurisdiction with that of sister state agencies and "there is nothing to prevent Arizona Water from asking the Commission to allow it to curtail service in appropriate circumstances."

### Attorneys' Fees

¶ 29 Our next issue is the trial court's award of attorneys' fees to Arizona Water, an award we review for an abuse of discretion. *City of Tempe v. Outdoor Systems, Inc.*, 201 Ariz. 106, 113, ¶ 31, 32 P.3d 31, 38 (App.2001). The award was made pursuant to A.R.S. § 12–348(A)(2) which permits a court to grant fees and other expenses to a party that "prevails by an adjudication on the merits in ... [a] court proceeding to review a state agency decision." Subsection (E)(2) of the statute directs that the fee award is to be calculated at $75 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee."

¶ 30 The parties have presented two discrete issues under this heading. The Department first argues that Arizona Water was not the prevailing party below, a contention we dispose of summarily. A "prevailing party" under A.R.S. § 12–348 is one who "prevails by an adjudication on the merits." *Corley v. Arizona Board of Pardons & Paroles*, 160 Ariz. 611, 614, 775 P.2d 539, 542 (App.1989). Here, Arizona Water brought suit against the Department on the basis that the groundwater conservation requirements in the second management plan were contrary to law because they failed to account for end users as required by the Code. This was the only substantive issue decided by the trial court, and that court agreed with Arizona Water. In the superior court then, Arizona Water was clearly a prevailing party by an adjudication on the merits.

¶ 31 The next issue is more troublesome. The trial court exceeded the $75 hourly rate called for by the statute, justifying its decision on the basis that "there has been a great deal of inflation since 1981" and

"specialized knowledge and expertise was brought to bear on behalf of the Plaintiff to a very substantial extent in this action." The court did not, however, award Arizona Water fees at the rate the company requested, which was the prevailing rate for the company's attorneys that ranged from $105 to $290 hourly. Rather, without specifying a rate or making any reference to the 1056 hours of attorney work claimed in the fee application, the court gave Arizona Water $137,900 of the $202,000 it had sought.

¶ 32 The Department urges that the trial court should not have exceeded the statutory cap. Arizona Water counters that the court should have employed the prevailing hourly rate of Arizona Water's attorneys. We do not agree with either position, but neither can we agree with the trial court because the record is such that we cannot effectively review the award under the applicable statute.

¶ 33 We first observe that A.R.S. § 12–348(E)(2) sets a presumptive hourly rate but offers the benefit of an increased rate provided the requisite showing can be made. It is generally held that a person seeking a benefit granted by a statute has the burden of proving he is entitled to that benefit. *Harvest v. Craig*, 195 Ariz. 521, 524, ¶ 15, 990 P.2d 1080, 1083 (App.1999). Thus, Arizona Water was required to prove it came within the exception to the $75 per hour cap.

¶ 34 The important questions are what must an applicant prove and how must he prove it. As we read the statute, the applicant must prove an increase in the cost of living or a special factor. Because this provision is in the disjunctive, proving either will suffice.

¶ 35 Proving the rate of increase in the cost of living seems a relatively straightforward assignment that, once accomplished, would permit establishing justification for a higher hourly rate through appropriate calculations. However, the actual increases and their effect on the statutory hourly rate must be demonstrated by acceptable evidence. It is not enough simply to opine that "there has been a great deal of inflation." When there is no acceptable evidence establishing the

540

actual cost of living increases, and the effect of such increases on the statutory hourly rate, a trial court is not permitted to increase an award based on the cost of living factor.

¶ 36 We caution, however, that simply proving cost of living increases does not necessarily entitle an applicant to a higher rate. Under the statute, the award of a higher rate is still a discretionary decision by the trial court. The court must therefore consider other relevant factors that could be implicated in a decision to award fees, including, without limitation, the quality of the representation and the difficulty of the work. Moreover, the court should consider those factors in light of the policy of A.R.S. § 12–348 itself which is to reduce, but not necessarily eliminate, the resource disparity between private parties and the government and thereby diminish the economic deterrent to litigating with the government.

¶ 37 The successful applicant is likely to be the one who proves both cost of living increases and a special factor. What, then, is a special factor? We turn to that question.

¶ 38 We begin by explaining what a special factor is not. Possessing "specialized knowledge and expertise," the trial court's basis for its award, is simply too common an attribute to be useful in identifying litigation deserving of an amplified award. We must remember that A.R.S. § 12–348 covers a great variety of litigation and includes areas of the law in which there could be numerous individuals with specialized knowledge and expertise. Categorizing that attribute as a special factor could make amplified awards the rule rather than the exception.

¶ 39 The single example of a special factor given by the statute must serve for now as the measuring stick by which applicants are judged. That example, "the limited availability of qualified attorneys for the proceeding involved," focuses on the number of qualified attorneys there are in the state who could litigate the matter at issue. Obviously, the fewer such attorneys there are, the more likely an amplified award will be merited, but it is impossible to reduce this to a formula with absolute numbers. What clearly is necessary, however, is that there be some actual evidence of available qualified attorneys presented to the trial court so that it can exer-

cise a reasoned discretion in determining whether this factor has been proven.

¶ 40 The statutory example also takes into account the type of litigation being prosecuted. One would assume that in areas of the law where there is a large client base, there will be a substantially greater number of attorneys qualified to litigate. Where the area is more arcane, there will likely be only a few.

¶ 41 As for what other special factors there may be, we hesitate to comment beyond the illustration provided by the statute. This is an area that is best developed on a case-by-case basis. What we do hold is that the applicant for an amplified award has the burden of proving entitlement thereto. And he must do so by presenting actual evidence upon which the trial court can base such an award. Assumptions and speculation will not suffice.

¶ 42 In this case, we assume the trial court used the concept of "inflation" as a synonym for cost of living. The court was correct to regard this as a factor that might justify an amplified award, but there was no acceptable evidence of what the increases in the cost of living had been since 1981, the year A.R.S. § 12–348 was first enacted, and how those increases affected the statutory rate. What the record shows is that counsel for the parties each presented a cost of living increase analysis in their pleadings, but they differed significantly as to the result to be reached. Essentially, a disputed issue of fact was presented that should not have been resolved simply on the basis of the pleadings. The parties should have been required to present some evidence from which the trial court could have judged how the increases should amplify the hourly fee beyond the statutory presumption of $75. Without such evidence, and a factual resolution by the trial court, we have no basis to determine whether the court's award was warranted by "inflation."

¶ 43 As for any other special factor, the record contains nothing upon which a finding meeting the statutory criterion could be based. The only evidence presented was an affidavit of Arizona Water's counsel outlining his qualifications and those of his colleagues.

While this may suffice to show they were "qualified" attorneys, it tells us nothing about the statewide pool of available attorneys who could effectively handle groundwater litigation.

¶ 44 In short, the record before us cannot support the attorneys' fee award made by the trial court. We must therefore vacate that award and remand this matter to give Arizona Water the opportunity to properly prove entitlement to an amplified fee. Because we are remanding this issue, we comment on an additional argument made by Arizona Water.

¶ 45 Arizona Water asserts that assuming it qualifies for an amplified fee, the trial court should be directed to base its award on Arizona Water's customary hourly fee. Relying on *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983), Arizona Water asserts that an appropriate hourly fee in public-rights litigation should mirror "the reasonable hourly rate prevailing in the community for similar work." *Id.* at 187, 673 P.2d at 931. Arizona Water argues that its fee calculations did just that and it should therefore have been awarded the full amount requested.

¶ 46 *China Doll* itself answers this contention negatively. The *China Doll* court was careful to explain that the method of fee ascertainment it espoused was simply not applicable when the award was based on "statutes limiting or restricting the amount of fees which may be awarded." *Id.* at 186, 673 P.2d at 930. The court cited as an example the very statute with which we deal in this litigation.[2] *Id.* Thus, we conclude that an A.R.S. § 12–348 award is not subject to the *China Doll* "community hourly rate," nor can that rate be considered a "special factor" as that term is used in the statute.

### Central Arizona Project Water

¶ 47 The last issue is whether the Groundwater Code permits the Department to count a municipal provider's Central Arizona Project ("CAP") water as part of its overall water supply in determining that provider's compliance with the Total GPCD program. We conclude that our prior case of *Arizona Municipal Water Users Association*

*v. Arizona Department of Water Resources,* 181 Ariz. 136, 888 P.2d 1323 (App.1994) controls the disposition of this issue, and that disposition is the Department can include CAP water in determining a provider's compliance.

¶ 48 In *Water Users,* the court faced the same issue as we do here except that the water source involved was recovered effluent rather than CAP water. Rather than duplicate the analysis of *Water Users* in this opinion, we simply set forth the court's explanation of the issue and thereafter adopt its reasoning and conclusion. We begin with the issue statement of the case:

> According to a groundwater management plan authorized by statute, the Department establishes a municipal water provider's total gallons per capita per day ("GPCD") requirement. This GPCD requirement limits the total amount of water that such provider is legally entitled to "withdraw, divert or receive" during the year. In simple terms, if the total amount of water used by a municipal provider from all sources, including groundwater, exceeds the provider's GPCD requirement, the provider is out of compliance with the management plan to the extent that groundwater usage makes up the excess. Although the management plan includes water from all sources in determining whether a municipal provider has exceeded its GPCD requirement, groundwater usage is counted last. According to the management plan:

> > This is consistent with the intent of the Groundwater Code that other available sources of water be used before groundwater is used. It also allows the Department to determine whether, and to what extent, the provider has failed to reasonably reduce its per capita use of groundwater. If the total amount of water used by the provider during the year exceeds the amount of water reasonably necessary for its use, as reflected in its total GPCD requirement, the provider has failed to conserve the groundwater included in the excess. [citation omitted]

2. A.R.S. § 12–348(D)(2), now (E)(2).

The basic question for decision is whether, in calculating if a municipal provider of groundwater is in compliance with the limitations for groundwater usage that have been placed upon it by the Department, recovered effluent is to be included or excluded from consideration. If recovered effluent is excluded from the calculation, a municipal provider may use more groundwater in meeting its requirements and still remain in compliance with the plan.

181 Ariz. at 137, 888 P.2d at 1324. Substituting "CAP water" for "recovered effluent" in this issue statement suffices to correctly state our issue.

¶ 49 The *Water Users* court agreed with the Department that it was authorized to include recovered effluent because the Groundwater Code "(1) requires the Department to establish groundwater conservation measures and to make reasonable reductions in the per capita use of groundwater supplied by large municipal water providers, and (2) [the Code] indicates a legislative intention that the Department count water used from all sources in determining municipal compliance with the groundwater conservation measures." *Id.* at 141–42, 888 P.2d at 1328–29. The court's primary support for the latter conclusion stemmed from its interpretation of A.R.S. §§ 45–565(A)(2) and 45–561(11), which together require reduction in "municipal uses" of "water," which the court construed to refer to all sources of water except those specifically excluded. 181 Ariz. at 142–43, 888 P.2d at 1329–30. Thus, the Department had "the authority to count water used from sources other than groundwater in determining municipal compliance with groundwater conservation requirements." *Id.* at 142, 888 P.2d at 1329.

¶ 50 Arizona Water argues that permitting the Department to count CAP water amounts to regulation of the use of such water, a violation of both federal law and A.R.S. § 45–107 which grants the Department an advisory, not a regulatory, role with respect to those who contract for CAP water. To this assertion we give the same response as did *Water Users* to the contention in that case that the Department was attempting to regu-late effluent, a source that admittedly the Department had no authority to control. *Water Users* pointed out that even assuming the Department was including "effluent," as opposed to the entirely different source called "recovered effluent," counting effluent in a provider's total GPCD obligation did not regulate effluent because non-compliance with the GPCD was measured not by how much effluent was used but "only to the extent which groundwater use exceeds a provider's total GPCD requirement." *Id.* at 141, 888 P.2d at 1328. "Accordingly, the Department regulate[d] only groundwater usage." *Id.*

¶ 51 Arizona Water also seeks to distinguish *Water Users* based on that case's description of recovered effluent as essentially groundwater.[3] According to Arizona Water, this demonstrates that *Water Users* reached the conclusions it did because it viewed its case as dealing strictly with groundwater and thus its "findings do not apply to this case." This is so, Arizona Water reasons, because CAP water is surface water that never enters the groundwater table.

¶ 52 We do not read *Water Users'* equating of recovered effluent to groundwater as anything more than a makeweight argument that was unnecessary to its conclusion that the Department was authorized to count **all** sources of water in determining a provider's total GPCD requirement. As such, the comment was dictum. *See Creach v. Angulo,* 186 Ariz. 548, 552, 925 P.2d 689, 693 (App.1996) (that which is unnecessary to a court's decision is dictum). The heart of *Water Users* is its acknowledgment that the Department is operating under a legislative mandate to reduce per capita use of groundwater. 181 Ariz. at 143, 888 P.2d at 1330. The Department's response to this mandate is a GPCD requirement based on total water use that requires that "surface water and recovered effluent," as well as groundwater, be counted. *Id.* "Otherwise, the GPCD requirement would be distorted and the statutory mandate of reasonable reductions in the per capita use of groundwater could not be

---

**3.** "Recovered effluent" is defined in the second management plan as "effluent that has been stored pursuant to an underground storage and recovery permit and recovered outside the area of hydrologic impact."

achieved." *Id. Water Users* is directly on point and compels our conclusion that the Department may count CAP water in establishing a municipal provider's total GPCD requirement.[4]

## CONCLUSION

¶ 53 For the reasons set forth above, we affirm the trial court's judgment that the groundwater conservation measures in the second management period are inadequate because they fail to address water utilization by end users. We vacate the trial court's award of $137,900 in attorneys' fees to Arizona Water and remand that issue to the trial court for further proceedings consistent with this opinion. Finally, we find that the Department is permitted to count CAP water in determining a municipal provider's compliance with the Total GPCD Program.

¶ 54 Arizona Water has requested attorneys' fees on appeal pursuant to A.R.S. § 12–348(E)(2). Arizona Water has prevailed on one issue, lost on another, and failed for now to successfully defend or increase the attorneys' fee award issued by the trial court. In these circumstances, Arizona Water cannot fairly be said to be the prevailing party on appeal, and we therefore decline to make an award.

CONCURRING: LAWRENCE F. WINTHROP, Judge.

IRVINE, Judge, concurring in part and dissenting in part.

¶ 55 The essence of this dispute is Arizona Water's position that the Groundwater Code's conservation measures do not require it to change its operations in any significant way. Its position is that the Department can impose limits on the per capita water use of its customers, but that a private water company only has a limited role in implementing those limits.

¶ 56 I believe the Department properly implemented the Act by making providers the primary focus of the per capita water conservation measures. This recognizes that providers differ significantly in their sources and uses of water while allowing providers considerable latitude in developing conservation plans and programs suitable for their own customers and geographic areas. It also recognizes that providers ultimately control whether customers receive groundwater or water from other sources. Because the trial court never squarely addressed the essential issues of this case, and because I disagree with its finding that the Second Management Plan ("SMP") cannot be enforced against Arizona Water because the municipal conservation program fails to address water utilization by end users, I respectfully dissent.

¶ 57 After exhausting administrative remedies, Arizona Water challenged the applicability of the Department's SMP to its Apache Junction water system in superior court. It argued the SMP improperly (1) regulated municipal providers under the provision of the Groundwater Code that applies solely to water users, (2) included Central Arizona Project ("CAP") water in the calculation of its conservation requirements, (3) failed to regulate individual users, and (4) conflicted with the Arizona Corporation Commission's jurisdiction to regulate private water companies.[5] The trial court determined that the SMP must regulate end users and never squarely addressed the remaining issues.

¶ 58 The majority affirms the trial court on the end user issue, but goes on, correctly I believe, to decide the CAP issue. I concur in the portion of the opinion addressing the inclusion of CAP water in the GPCD calculation.

---

4. Arizona Water has raised another issue not decided by the trial court, namely whether its GPCD requirements ought to be increased to account for the increase in demand by non-residential users in its Apache Junction system. We do not address this issue as counsel for Arizona Water informed us at oral argument that the facts underlying this issue may change if we affirm the trial court's conclusion that the Department must include end users in its conservation measures.

5. Although not relevant to this appeal, Arizona Water also argued that the Department improperly calculated its GPCD requirements in several ways, enforcement of the SMP and GPCD requirements resulted in an impermissible taking in violation of the United States and Arizona constitutions, and the SMP and GPCD unfairly discriminate against Arizona Water in violation of the equal protection clause.

¶ 59 The majority also correctly resolves the issue of conflicting jurisdiction between the Department and the Corporation Commission by noting that the Commission does not see an irreconcilable conflict. The Department and the Commission regulate Arizona Water in different ways, with the Department's focus being on the source and quantity of water available. The Commission regulates a private water company's relationship with its .customers. If sufficient water is not available to serve them all, the Commission will have to approve any curtailment plans. There is no inevitable conflict between the jurisdictions of the Department and the Commission, and we should not address a speculative conflict.

¶ 60 Although the majority agrees that the per capita water conservation provisions of the SMP apply to a municipal provider, see ¶ 27, it chooses not to fully address the issue because it thinks the issue was not raised in Arizona Water's response or that the facts surrounding the GPCD limit may change upon remand. I believe the issue was squarely raised by Arizona Water, both in the trial court and here, and that the issue cannot be separated from the end user issue. Moreover, Arizona Water's witness at the administrative hearing testified that the "crux of the problem" of compliance with the GPCD requirement was the inclusion of CAP water in the calculation. Waiting for the numbers to be reworked upon remand will not change this, particularly in light of Arizona Water's repeated statements that there is little potential for conservation by end users in its service area. Failure to definitively resolve this issue will needlessly prolong this litigation. Therefore, I address it in more detail.

¶ 61 Arizona Water argues in its answering brief that "A.R.S. § 45–565(A)(2) does not permit the Department to impose a GPCD requirement on providers who *withdraw* and *distribute* groundwater. Rather, the statute mandates that conservation requirements

shall be placed on those 'individual users' who *use* groundwater (i.e., end users or customers)." The trial court accepted the argument that the SMP must address end users, but never answered the more basic question whether the GPCD requirement may be imposed on Arizona Water.

¶ 62 Both this Court's holding in *Water Users* and the majority's holding regarding CAP water implicitly accept the fact that the per capita water conservation provisions of A.R.S. § 45–565(A)(2) apply to providers. The legislature's intent to impose the obligation is further shown by the language of A.R.S. § 45–565.01, which allows a *provider* to comply with a non-per capita conservation program.[6] Whether the SMP must directly regulate end users or not, Arizona Water must comply with the GPCD requirements of the SMP.

¶ 63 Arizona Water argues this is unfair because Apache Junction has experienced significant increases in demand by non-residential water users. The increase in non-residential use increases actual demand without increasing the population factor used to compute compliance with the GPCD program. I believe the statutory requirement that the SMP include reductions in per capita water usage mandates a conservation plan based on population, not non-residential use, so the SMP is valid.

¶ 64 In the First Management Plan, the Apache Junction system was assigned a total GPCD requirement of 144 (gallons per capita per day). At that time groundwater was the system's only source of water. In preparing the SMP the Department determined that the actual GPCD for 1984, 1985 and 1986 were 172, 141 and 171, respectively.[7]

¶ 65 The SMP's target rate for Arizona Water's Apache Junction system was also 144 GPCD, dropping to 141 GPCD in 1995 (141 GPCD was the minimum for any water system). The reduction from 144 to 141 was based on the Department's determination

6. The majority finds A.R.S. § 45–565.01 irrelevant to the issue of whether the statute requires that conservation measures be imposed on end users. As I read the argument, the Department primarily cites the statute to counter Arizona Water's argument that the GPCD requirement applies *only* to end users.

7. Arizona Water successfully argued in the administrative process that the Department undercounted the population of its Apache Junction service area in calculating GPCD. In general, if a higher population number is used in the calculation, the GPCD number is lower.

that there was some conservation potential in interior water use by existing customers and in water use by new customers. When the SMP was promulgated in 1989 the Apache Junction service area's population was estimated to be 20,557, and it pumped and used approximately 2,400 acre feet of groundwater. In 1988, Arizona Water also began to use its allocation of 6,000 acre feet of CAP water, using 1,466 acre feet in 1989. The Department determined that Arizona Water's actual GPCD for 1989 was 167.

¶ 66 By 1997, the population of the system increased by approximately 50 percent, and the use of groundwater had increased to 3,920 acre feet. CAP deliveries were 4,496 acre feet. The Department calculated the actual GPCD as 271. At the 1998 administrative hearing Arizona Water's witness testified that a GPCD of 290 would allow it to serve its existing customers, but that future growth could lead it to ask for additional increases.

¶ 67 There is no dispute that the increase in GPCD resulted mainly from increases in non-residential uses. Arizona Water describes the change as follows:

> Perhaps most critically, the water use characteristics of AWC's customers in its AJ System have changed dramatically since the enactment of the Groundwater Code. In the early 1980s, Apache Junction was a rural residential area. It has since experienced a dramatic increase in non-residential uses. As a result, according to the Department, the water usage rate by utility customers served by the AJ System has increased from 141 gallons per capita per day ("GPCD") in 1984 to 281 GPCD in 1997. AWC's customers' increasing demand for water for non-residential uses is the result of industrial facilities and golf courses being developed in AWC's service area. For example, six full-size golf courses and one executive (9–hole) course ·have opened in Apache Junction since the First Management Plan was adopted.

Five of these courses have been built since 1994. Notably, AWC supplies all of the full-size golf courses exclusively with a combination of imported Central Arizona Project ("CAP") water and effluent, and the nine-hole executive golf course receives only a small portion of groundwater. (Citations omitted.)

Significantly, the use of CAP water by Arizona Water and its customers is not regulated by the Groundwater Code. In effect, Arizona Water has chosen to serve new non-residential customers, such as golf courses, by delivering unregulated CAP water, while new residential customers are served by pumping more groundwater.[8]

¶ 68 Arizona Water argues that the Department must increase its GPCD to reflect this choice. The Department points out that the Groundwater Code requires "reasonable *reductions* in per capita use," A.R.S. § 45–565(A)(2), and management plans are directed to include a continuing mandatory conservation program "designed to achieve *reductions* in withdrawals of groundwater." A.R.S. § 45–563(A)(emphasis added). As this Court recognized in *Water Users,* and the majority recognizes in its discussion of CAP water, reductions in groundwater use will not occur if non-groundwater sources of water are left out of the equation. *See Water Users,* 181 Ariz. at 143, 888 P.2d at 1330.

¶ 69 The requirement to achieve reductions in per capita use allows a provider to increase its water use as its population increases. Nevertheless, the provider is generally prevented from serving new large non-residential uses without a proportionate increase in population. Although this may prevent a provider from serving all the new non-residential uses it would like to serve, this does not result from any arbitrary decision by the Department, but from the legislature's mandate that per capita water use should be reduced.

¶ 70 Imposing the GPCD requirement on providers, and including CAP water in the

---

8. The record does not fully explain the rationale for this choice, but it may be related to the fact that CAP water costs more than groundwater. If Arizona Water served existing customers with CAP water instead of groundwater it would be adding additional costs that would have to be passed on to those customers. By serving new customers with CAP water the added costs are covered by new revenue sources. The record shows that Arizona Water has agreements with the golf course owners regarding their receipt of the CAP water, but the agreements themselves are not in the record.

calculation, leads to reductions in groundwater use by requiring municipal providers with new non-groundwater sources, such as CAP water, to replace existing groundwater uses with non-groundwater instead of using the new water to serve large new non-residential uses such as golf courses. Arizona Water complains that this penalizes its service area for being undeveloped prior to the enactment of the Groundwater Code because non-residential water usage in areas previously developed would be built into those areas' GPCD. For example, groundwater used to water a golf course built in 1979 will be included in the calculation of the GPCD limit but water used to serve golf courses built in the 1990s must fit within the previously determined limit. Arizona Water may have a valid complaint, but its conclusion that water usage limits cannot legally be imposed if they limit non-residential growth is erroneous. The concept of priority of earlier users is embodied in Arizona water law. *See Arizona Copper Co. v. Gillespie*, 12 Ariz. 190, 100 P. 465 (1909). The Groundwater Code follows this concept by allowing existing users to continue at the same level subject to the conservation programs established in the management plans. New uses, however, are limited. A.R.S. §§ 45–464 (limiting increases in non-irrigation uses of groundwater); 45–465 (limiting irrigation uses of groundwater).

¶ 71 The legislature has plainly enacted a policy of limiting groundwater use, and reducing per capita water usage as a means of meeting such limits. The Department's policy of giving municipal providers a target GPCD that includes water from most sources is a rational way of implementing that policy. Arizona Water's claim that the per capita limits do not apply to it, or should be increased, should be rejected.

¶ 72 Both parties extensively discuss the alternatives to the total GPCD program that are available to water providers. Each alternative allows providers with access to non-groundwater supplies to expand non-residential service in a manner that would not be allowed under the total GPCD program, but imposes other limits on the use of groundwater. Arizona Water argues these plans are

not suitable for it. The Department disagrees. In either case, the significant points are that the GPCD applies to Arizona Water and CAP water is included in the calculation. The availability of alternatives to the GPCD limits does not change this. The alternatives do, however, show that the legislature and the Department have not taken a one-size-fits-all approach to water conservation. If Arizona Water does not find the alternatives to its liking it should not look to the courts to set aside the GPCD program, but to the legislature to change the statutes. We should not set aside the management plan merely because Arizona Water has difficulty complying with its terms. *See Hunt v. Norton*, 68 Ariz. 1, 11, 198 P.2d 124, 130 (1948) (if a statute is oppressive or unworkable, relief lies with the legislature).

¶ 73 Furthermore, Arizona Water's arguments that the alternative programs do not work for it are based on circumstances existing in 1998, after it had committed its CAP water to newly built golf courses. They do not address whether Arizona Water could have benefitted from the Alternative Conservation Program in 1989 when the SMP was issued, or the Non–Per Capita Conservation Program in 1992 when it was enacted by the legislature. We will never know what would have happened if Arizona Water had attempted to comply with the SMP by using its CAP allocation to substitute for increased groundwater pumping. This may have required asking the Arizona Corporation Commission to approve a curtailment plan allowing Arizona Water to limit service to new large non-residential users such as golf courses, but doing so would be fully consistent with the policy of the Groundwater Code to "conserve, protect and allocate the use of groundwater resources of the state." A.R.S. § 45–401(B). As the facts currently exist, Arizona Water may find it very difficult to comply with the GPCD limits, but this difficulty largely results from its own choices, not from any arbitrary and capricious portion of the SMP.

¶ 74 Without addressing the GPCD or CAP issues the trial court set aside the SMP because it found that it failed to regulate all end users.[9] The majority accepts this. I do

---

9. The SMP does contain conservation requirements for three types of individual users: turf-

related facilities (schools, parks, cemeteries, golf

not. As explained below, I do not believe the statutes support the trial court's ruling. Even if they did I do not believe Arizona Water is entitled to have the plan set aside merely because it does not address end users. Arizona Water repeatedly states that its inability to comply with the GPCD requirement is mainly due to the inclusion of CAP water in the calculation and its delivery of CAP water to new golf courses. It also repeatedly points out that the Department cannot regulate the use of CAP water by those golf courses. Because CAP water is properly included in the calculation, amending the plan to regulate end users will not significantly affect Arizona Water's lack of compliance with the GPCD requirement.

¶ 75 The majority acknowledges that "there is no specific statutory provision by which the legislature definitively ordered the Department to create and impose conservation measures for end users," but believes a requirement that a plan must include such regulation is the most reasonable and sensible interpretation. I disagree for several reasons.

¶ 76 First, the legislature has given the Department the authority to develop management plans and conservation requirements. "[T]his court gives great weight to an agency's interpretation of statutes and its own regulations." *Water Users,* 181 Ariz. at 142, 888 P.2d at 1329. We properly gave great weight to the Department's interpretation of the Groundwater Code in *Water Users,* and the majority does so again in this case by including CAP water in the GPCD calculation. We should do the same in interpreting the end user requirements. The Department has interpreted the statutes as giving it the authority to regulate end users, but not mandating such regulation. Given the lack of specific statutory language to the contrary, its interpretation is reasonable.

¶ 77 Moreover, whether it is sensible to regulate end users is simply not addressed by the record before us and is completely beyond our expertise. The Department is required by statute to develop management plans after publicly presenting data in support of the plan. *See* A.R.S. § 45–570 (2003).

After a public hearing at which any person may submit evidence for or against the adoption of the plan the Department must make and file a written summary and findings with respect to matters considered during the hearing. *Id.;* A.R.S. § 45–571 (2003). After completing this process for the SMP the Department concluded that direct regulation of most end users was not appropriate. The legislature delegated such choices to the Department, not to us, so we should leave its choices in place.

¶ 78 Next, the key language of the Groundwater Code states that the SMP must "require additional reasonable reductions in per capita use to those required in the first management period and use of such other conservation measures as may be appropriate for individual users." A.R.S. § 45–565(A)(2). The language "as may be appropriate for individual users" is the only statutory language to specifically address conservation requirements for end users. It plainly does not require restrictions on all end users, but only as the Department determines "may be appropriate." The words "as may be appropriate" are permissive rather than mandatory, and give the Department discretion to determine which, if any, individual users should be regulated directly through conservation requirements. The trial court effectively read the phrase "as may be appropriate" out of the statute. As the most specific reference to conservation requirements for end users, I find it controlling.

¶ 79 The statutory language that the management plans include "reductions in per capita use" also leads me to believe that the legislature did not mean to require that all end users be directly regulated by the Department. The phrase refers to reductions in the average use per person and does not require reductions by any particular user. While the Department does have the authority to directly regulate individual users of groundwater, as it considers appropriate, the legislature generally allows each provider the flexibility to develop conservation plans that will be appropriate for its own environment.

courses and common areas of housing developments that apply water to a water-intensive landscaped area of ten or more acres), publicly

owned rights-of-way, and new large cooling users.

¶ 80 The majority relies on general language in several other provisions of the Groundwater Code instead of the specific language of A.R.S. § 45–565(A)(2).[10] None of these provisions is as specific as the "as may be appropriate" language of A.R.S. § 45–565(A)(2), so the discretion given the Department by that section should be recognized. Section 45–463, A.R.S., does refer to persons "receiving" groundwater, but the general nature of the provision is not sufficient to overcome the specific language of section 45–565(A)(2). Moreover, the Department believes that it has developed a conservation program for all persons in the SMP by imposing conservation requirements on providers, as well as by considering end user restrictions for a wide variety of end users in its development of the SMP. Given the lack of specific language requiring regulation of end users, I cannot conclude that the legislature intended the management plans to be invalid in the absence of such regulation.

¶ 81 Citing "common sense," the majority states that "if the manager is to obtain the desired conservation result, all those participating in the cycle must be managed directly in regard to their conservation responsibility, including the customer who uses the groundwater and not just the provider who extracts, transports, and delivers it to him." The legislature has recognized, however, that regulating water use in this state is an incredibly complicated task, and has created the Department to carry it out. A.R.S. § 45–103(2003). After public hearings and due consideration the Department concluded that it was appropriate to directly regulate only certain individual users. We should defer to that conclusion.

¶ 82 Moreover, it is not clear to me that direct regulation of all end users is sensible water policy. The Groundwater Code recognizes that water providers are not in identical situations. Some have extensive surface water rights, while others rely exclusively on groundwater. Some have CAP allocations or the ability to acquire additional water rights. Local water providers have the best understanding of their own situations and may reasonably choose different methods to achieve their conservation targets. Uniform end user restrictions throughout an active management area, or even a local service area, may not be the most effective conservation method. Indeed, imposing conservation requirements on all end users who receive groundwater may do little to reduce total groundwater use if the provider can exempt select customers from the requirements by serving them with non-groundwater.[11] The resources devoted to creating and enforcing individual conservation requirements may be more effectively utilized in other ways. Again, this is the type of decision the legislature has left to the Department, not to us.

¶ 83 Arizona Water complains that a private company has no authority to force conservation measures on individual users, so such actions must be taken by the Department. Once again, the statute requires limits on individual users only as the Department finds they "may be appropriate." Moreover, private water companies do have the ability to influence water usage by their customers. As the Corporation Commission

10. See ¶¶ 15–17, citing A.R.S. §§ 45–401(B) (general policy that the Code was designed to create a framework for the "comprehensive management and regulation of the withdrawal, transportation, use, conservation and conveyance of rights to use groundwater in this state"); 45–492(A) (granting municipal providers in an active management area "the right to withdraw and transport groundwater within its service area for the benefit of landowners and residents within its service area, and the landowners and residents are entitled to use the groundwater delivered," each "subject to ... [c]onservation requirements developed by the director pursuant to article 9 [management plans] of this chapter."); 450563(A) (requiring "a continuing mandatory conservation program for all persons withdrawing, distributing or receiving groundwater").

11. For example, the SMP's restrictions on turf facilities such as golf courses do not apply to the large golf courses served by Arizona Water because it has chosen to serve them only with CAP water. Arizona Water's witness at the administrative hearing testified that the original Gold Canyon golf course was constructed in the early 1980s and was first served by groundwater, but later switched to CAP water. The ability of a water provider to switch a customer from a regulated source of water to an unregulated source highlights the need to include CAP water in the GPCD calculation and the difficulty of achieving per capita reductions in water usage if only end users of groundwater are regulated.

states in its brief, "there is nothing to prevent Arizona Water from asking the Commission to allow it to curtail service in appropriate circumstances." The record also shows that Arizona Water's customers are already very efficient in their use of water compared to other areas of the active management area. This efficiency was achieved without Arizona Water having the power to mandate conservation requirements, so it appears that there are measures that a private water company can take to encourage efficiency.

¶ 84 The trial court's ruling regarding end users does little to resolve this dispute. Because the statute itself does not specify how or which individual users are to be regulated, the trial court was unable to articulate how the Department could correct the management plan. In a conference with the parties the trial court tried to explain its ruling:

> That may sound more significant than it is, however, I did not [conclude] that the Department needs to address user by user, the allocation of water to every potential user and actual user. I do not think that is the law, and I don't think that is what the Department needs to do.

> * * *

> And I hesitate to keep repeating. I don't think that means an allocation for each user or necessarily even for each category of user, but in some way we have to meet the statutory mandate of having something in a plan that addresses the problem with an end user rather than putting the intermediary in this case, Arizona Water Company, in a position of deciding who to serve and how to serve them.

The trial court's final order simply concluded that "[t]he SMP cannot be enforced as written because the municipal conservation program fails to address water utilization by end users."

¶ 85 As noted above, the Department believes it complied with the statutes by considering conservation measures for individual users and including the three it found appropriate, as well as by indirect regulation through providers. At oral argument before us, Arizona Water articulated a position that all users must be addressed, but that it could be done by classes. The trial court's statement disagree with both these positions, but fail to explain what it would regard as passing legal muster. The conclusion I draw is that no matter what the Department does Arizona Water is likely to disagree because it is impossible for the Department to tie its actions to any specific statutory language. More years of litigation will follow.

¶ 86 The reason the trial court had so much trouble articulating a standard against which the SMP should be judged is that the legislature did not provide such a standard. The legislature gave the Department the authority to develop the plan, and the plan could include conservation measures "as may be appropriate" for individual users. The legislature set out a detailed and public procedure the Department must follow in developing the plan, but beyond that the details were left to the sound and educated discretion of the Department. Arizona Water does not argue that the specific end user measures adopted by the Department are not "appropriate." If it made such an argument courts would have a statutory basis upon which to review the actions of the Department. The trial court's order here, however, merely tells the Department to again exercise its discretion to develop a management plan, but to do it better. Its inability to be more specific is strong evidence that the language of the statute simply does not support its ruling.

¶ 87 "Neither this court nor the superior court may substitute its judgment for that of the agency on factual questions or matters of agency expertise," but "[w]e apply our independent judgment ... to questions of law, including questions of statutory interpretation and constitutional claims." *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557, ¶ 7, 48 P.3d 505, 507 (App. 2002). Whether the SMP must directly impose conservation requirements on end users, and to what extent, is simply not a question of statutory interpretation that we may independently decide. The statute unambiguously provides that the conservation program will include "such other conservation measures as may be appropriate for individual users." A.R.S. § 45–565(A)(2). Determining what is "appropriate" falls within the Department's mandate and expertise

**550**

and requires extensive knowledge of water law, science, practice and policy. Because the statute does not contain a specific mandate that the SMP must directly regulate end users, neither this Court nor the superior court should substitute its own judgment as to what constitutes sound water policy for this state.

¶ 88 For these reasons I respectfully dissent from the majority's affirming the trial court's order setting aside the SMP. I would reverse the trial court on that issue and remand for further proceedings. I concur in the majority's analysis of the CAP water. Under my analysis, Arizona Water would not be the prevailing party, but in light of the majority's ruling I agree that Arizona Water was the prevailing party in the trial court and concur in the majority's analysis of the attorneys' fees issue.